Docket No. 98609.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MICHAEL RIVERA, Appellant.

*Opinion filed November 29, 2007.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, Garman, and Burke concurred in the judgment and opinion.

## OPINION

Defendant, Michael Rivera, was charged in the circuit court of Cook County with two counts of first degree murder. Following a jury trial, defendant was found guilty and was subsequently sentenced to 85 years' incarceration in the Illinois Department of Corrections. Defendant appealed, arguing, that (1) the trial court erred when it *sua sponte* raised a reverse-*Batson* (see *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)) challenge to his use of a peremptory challenge during jury selection; (2) the procedure resulting in the imposition of his extended-term sentence violated the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and (3) the procedure resulting in the imposition of his extended-term sentence violated his right to a jury

trial as guaranteed by the Illinois constitution. A divided appellate panel rejected those contentions and affirmed defendant's conviction and sentence. 348 Ill. App. 3d 168. We granted the plaintiff's petition for leave to appeal. 210 Ill. 2d R. 315.

When the matter was initially before this court, defendant advanced multiple arguments, all of which were merely facets of the same *Batson* and *Apprendi* arguments defendant raised below. Specifically, defendant submitted that (1) trial judges do not have third-party standing to raise *Batson* challenges *sua sponte*; (2) the trial court's *sua sponte Batson* challenge to defense counsel's peremptory strike of juror Deloris Gomez was incompatible with the three-step *Batson* process; (3) the trial court erred in proceeding to the second step of the *Batson* process where no inference of a *prima facie* case of discrimination had been established; (4) the trial judge erred in his ultimate determination that defense counsel discriminated against juror Gomez; (5) the trial court's improper denial of defense counsel's peremptory strike of juror Gomez was reversible error; (6) the trial court's "violation of state statutory and constitutional guarantees to jury trial" are not amenable to harmless-error review; (7) *Apprendi* violations are not subject to harmless-error review; and (8) *Apprendi* violations in this case are not harmless beyond a reasonable doubt.

Upon our initial consideration of this matter, we held that a trial court has the authority to raise a *Batson* issue *sua sponte*, but "it may do so only when a *prima facie* case of discrimination is abundantly clear." *People v. Rivera*, 221 Ill. 2d 481, 515 (2006). We stated, when a court acts *sua sponte*, "the trial court must make an adequate record consisting of all relevant facts, factual findings, and articulated bases" for its finding of a *prima facie* case. *Rivera*, 221 Ill. 2d at 515. We concluded that the record before us did not reveal a *prima facie* case of racial discrimination, "if indeed that *** was the basis for the trial court's *sua sponte* action" (*Rivera*, 221 Ill. 2d at 515), as the State then argued (see *Rivera*, 221 Ill. 2d at 511 ("the State asserts that 'the trial court's remarks make it clear that the court's *sua sponte* reverse-*Batson* challenge was grounded solely on *** race' ")). We remanded this cause to the circuit court for a hearing on the matter of the existence of a *prima facie* case of discrimination, urging the trial judge to include in the record any omitted evidence pertinent to that question and to articulate proper findings of fact and conclusions of

law with respect to the threshold question of a *prima facie* case of discrimination, specifying, in particular, what *kind* of discrimination the judge believed was at issue, *i.e.*, race, gender, or combined race-gender. Because of our interim disposition, we did not address defendant's other issues.

The hearing in question has since been conducted, the trial judge having stated on the record that he believed a *prima facie* case of *gender* discrimination was evident when defense counsel sought to excuse juror Deloris Gomez by peremptory challenge. The matter now returns to this court for further consideration.

Pertinent facts prior to remand were fully set forth in our previous opinion. We reiterate facts as necessary to provide a framework for our disposition, beginning with the issue that resulted in remand.

During jury selection, defense counsel questioned juror Deloris Gomez, a business office supervisor at Cook County Hospital's out-patient orthopedic clinic. In the course of that questioning, Gomez acknowledged that Cook County Hospital is known for the treatment of gunshot victims and, as a part of her employment at the clinic, she has contact with patients, "checking them in." Gomez said her interaction with the victims of violent crime would not affect her ability to serve as a juror in the case. Following *voir dire*, and apparently in the presence of Gomez and other prospective jurors, defense counsel announced his intention to use his fourth peremptory challenge against Gomez, as the following excerpt from the transcript indicates:

> "MR. DECKER [defense attorney]: Your Honor, with thanks, we would ask to excuse Mrs. Gomez.
>
> THE COURT: I'm going to ask you to remain, Mrs. Gomez. I'm going to ask counsel to join me, if the court reporter will join me, and the defendant will join me in chambers. Excuse me, ladies and gentlemen."

In chambers, the court directed defense counsel to "kindly articulate a basis of why you are excusing Ms. Gomez." Defense counsel protested, "The court has done it on its own motion *sua sponte*." The trial court responded: "I will do it. It is the citizen's right to sit as a juror, and I will implicate myself *sua sponte* if I feel

somebody's rights are being impinged upon ***." Defense counsel then complied with the court's directive, responding:

> "Mrs. Gomez has a connection to a hospital that on a daily basis probably sees more gunshot victims than any other hospital in the world ***. Given that fact that she's in the orthopedic section, I think on a daily basis even though she's a supervisor, even though she's not a rehabilitative nurse, she on a daily basis sees those victims who are victims of violent crime. For those reasons it constrains me. I know she has some kind of Hispanic connection given her name. I'm pulled in two different ways. For those reasons I asked that the–."

At that point in defense counsel's explanation, the trial court interrupted counsel, noting that "Mrs. Deloris Gomez appears to be an African-American." The court then asked to "hear from" the State on the issue, the prosecutor having been totally silent and uninvolved to that juncture. After some initial observations regarding the theory of the case and the issue for the jury's consideration, the prosecutor, apparently sensing the court's sentiment, stated that the offered reason for excusing Gomez was insufficient. Defense counsel then noted that he had previously accepted an African-American woman to sit on the jury, and the court quickly pointed out that Gomez was the second "African-American female" that the defense had sought to exclude. The court stated it was the articulated reason given for the peremptory challenge of Gomez that was of particular concern. The court concluded:

> "I've heard her answers to the questions. I've looked at her jury information form, and I'm quite frankly very much concerned, Counsel, as to why Mrs. Deloris is being excused–Mrs. Deloris Gomez is being excused. She works in a clinical division of this hospital. It may have a reputation of having many emergency cases, I presume, involving gunshot cases, but again she works in a business office, the very first line identifying her job.
>
> * * *
>
> I did this *sua sponte* because I was concerned about the right of Mrs. Gomez to be a juror and participate. If the State in fact had done this, I certainly would have found they would

have established a *prima facie* case by the very reason–what I'm going to do is allow Ms. Gomez–allow her to be seated, not excuse her on the basis of your peremptory.

I feel under these circumstances the reasons given by you, Mr. Decker, do not satisfy this Court. As far as I'm concerned, it's more than a *prima facie* case of discrimination against Mrs. Gomez. I'm not going to allow her to be excused. She will be seated as a juror over objection."

Defense counsel then asked for, and was granted, leave to conduct further questioning of Gomez, and noted defendant's objection of record. After completing that questioning, counsel reiterated his previous bases for excusing Gomez. In apparent response to *his* perception of the court's concerns, counsel stated he was "not trying to excuse a juror because of her race." He then noted that the jury was comprised predominantly of women, and he offered that he was "trying to get some impact from *** men in the case." The circuit judge responded that he would "override" counsel's peremptory challenge and would seat Gomez as a juror as there was no basis for excusing her for cause.

Pursuant to our remand, a hearing was held on November 15, 2006. At that hearing, the trial judge, who had since retired, addressed the bases for his *Batson* rulings.

Whether intentionally or unintentionally, the judge's opening remarks make clear that he found race a significant factor in explaining his actions. He commenced with the observation that the murder victim "was an African-American male" and his mother "was also African-American." The judge pointed out: "The Defendant is Hispanic." The judge then proceeded to comment on the gender of jurors, but still noted racial characteristics:

"The jury was composed of a majority of women; I believe after a review of the transcripts, nine women and three men. One African-American female was accepted as a juror. Another whose race was in fact unknown was excused as well. Couldn't tell by her name what race she belonged to. No one had any personal recollection. One female was excused. She had been African-American as well. Defendant sought to excuse another female African-American, a Mrs. Gomez,

peremptorily. She was the third female juror challenged by the Defendant."

The judge noted that defense counsel's *voir dire* examination of Gomez "essentially went to the nature of her employment and the exposure she may have had to pictures of victims of violence." When counsel indicated he wanted to exercise a peremptory challenge against Gomez, the judge asked the parties to join him in chambers, where, according to the judge's assertions in the November 2006 hearing, he indicated he was "raising a *Batson* issue because Mrs. Gomez was in fact the second [*sic*] woman peremptorily challenged by the Defendant." We feel compelled to note, in passing, our foregoing, comprehensive recitation of events at the original trial, and our previous finding, which necessitated remand in the first place: "Because the trial court did *not* state the basis for its finding of *prima facie* discrimination, we do not know whether the trial court believed the peremptory challenge defendant sought to exercise against Gomez represented an instance of racial discrimination, or gender discrimination, or combined race-gender discrimination." (Emphasis added.) *Rivera*, 221 Ill. 2d at 511. Contrary to the judge's assertions otherwise, he never stated a basis for his finding. Moreover, to further clarify, we note, though the judge mentioned, in his remarks at the November 2006 hearing, defense counsel's *subsequent* comments as a basis for finding a *prima facie* case of discrimination, those comments were made *in response to* the court's direction to "kindly articulate a basis of why you are excusing Ms. Gomez." Again, as we pointed out in our prior disposition, under these circumstances, "[t]he existence of a *prima facie* case is a prerequisite for the court to demand an explanation." *Rivera*, 221 Ill. 2d at 510. "[T]he articulated reason for a challenge is a matter of 'concern' only *after* a *prima facie* case has been established." (Emphasis in original.) *Rivera*, 221 Ill. 2d at 510. Thus, where as here, the trial judge required defense counsel to explain the basis for exercising his peremptory challenge, the judge cannot use counsel's response to his command as a basis for finding a *prima facie* case in the first instance; yet that is what the judge appeared to do at the November 2006 hearing.

Thus, excluding remarks counsel made in response to, or as a result of, the judge's demand for a neutral explanation for the challenge, the bases articulated by the judge for finding a *prima facie*

case of gender discrimination against Gomez consist of the number of challenges exercised against women, and the "nature of the questions" counsel initially asked Gomez during *voir dire*. Although the judge subsequently mentioned that his observation of the parties played a part in the second and third steps of his *Batson* analysis, he made no such comment with respect to his initial finding of a *prima facie* case. He did not mention demeanor as a factor in that regard; nor did he specify what aspect of defense counsel's questioning troubled him.

At the outset of our analysis on this issue, we note the parties now argue that differing standards of review apply to the question of whether a *prima facie* case of discrimination was in evidence when the trial judge acted *sua sponte*. As defendant acknowledges, in our prior opinion, we stated that a manifest weight standard applied, relying upon *People v. Coleman*, 155 Ill. 2d 507, 514 (1993). See *Rivera*, 221 Ill. 2d at 502. However, defendant urges us to adopt a *de novo* standard with respect to questions of law inherent in the resolution of this issue. The State contends that manifest weight *is* the correct standard, quoting from this court's opinion in *People v. Mitchell*, 152 Ill. 2d 274, 288 (1992) ("[t]he trial court's [*Batson*] determination is a matter of fact, involving an evaluation of credibility"). We observe that the quote from *Mitchell* appears to apply to the *ultimate Batson* determination, rather than the *prima facie* determination specifically. That, however, is not the case with our prior reliance upon *Coleman*.

In any event, we reexamine this question in light of our prior disposition in this matter. When this case was previously before us, we remanded this cause to allow the trial judge an opportunity to "articulate proper findings of fact and conclusions of law with respect to the threshold question of a *prima facie* case of discrimination." *Rivera*, 221 Ill. 2d at 515-16. Such findings and conclusions are now essential prerequisites to proper review of *sua sponte* action on the part of the trial court, and a court that acts without making an appropriate record does so at its own peril. Given those requirements, we believe the appropriate standard of review should comport with that structure.

We generally apply a bifurcated standard of review in situations where a ruling presents a mixed question of law and fact. A trial court's ruling on a motion to suppress is a case in point. A trial court's findings of fact are not disturbed unless they are against the

manifest weight of the evidence, but the ultimate legal determination as to whether a motion to suppress should have been granted, based on those findings, is a question of law to be reviewed *de novo*. See *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Similarly, in administrative review, an agency's findings of fact are not reversed unless they are against the manifest weight of the evidence, and questions of law are reviewed *de novo. Girot v. Keith*, 212 Ill. 2d 372, 379 (2004). In light of the requirements we have imposed upon trial courts acting *sua sponte* in this context, we believe the bifurcated standard of review is appropriately applied here as well. Thus, when a trial court raises a *Batson* issue *sua sponte*, the court's findings of fact, including any specific observations of record bearing upon demeanor or credibility, will be accorded the deference the manifest weight standard provides; however, the ultimate legal determination based upon those findings is a legal determination we will make *de novo*.

We turn to the facts and conclusions presented by the original record, and the supplemental record compiled on remand, as they bear upon the existence or nonexistence of a *prima facie* case of *gender* discrimination, which is what the trial judge now claims prompted his action. In that regard, we see only two factors cited by the judge in support of his ruling. On remand, the judge stated he believed a *prima facie* case of gender discrimination was indicated because of the number of women peremptorily challenged by defendant (three) and the "nature of the questions" counsel initially asked Gomez during *voir dire*. Although the judge also referred to counsel's conduct and statements *after* the court demanded an explanation of counsel, as we have held, under the circumstances of this case, comments or conduct thereafter cannot serve as justification for the court's intervention in the first instance. See *Rivera*, 221 Ill. 2d at 510, 514.

Taking the relevant factors for evaluating a *prima facie* case of alleged *racial* discrimination (*People v. Williams*, 173 Ill. 2d 48, 71 (1996)), and modifying accordingly for alleged *gender* discrimination (see *Rivera*, 221 Ill. 2d at 501), we consider the following as pertinent in this context:

> (1) gender identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against female venirepersons; (3) a

disproportionate use of peremptory challenges against female venirepersons; (4) the level of female representation in the venire as compared to the jury; (5) the questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded female venirepersons were a heterogeneous group sharing gender as their only common characteristic; and (7) the gender of the defendant, victim and witnesses. See *Rivera*, 221 Ill. 2d at 501.

On remand, the trial judge stated that he believed a *prima facie* case of gender discrimination was indicated because of the number of women peremptorily challenged by defendant (three) and the "nature of the questions" counsel initially asked Gomez during *voir dire*. The judge's assertions seem to implicate factors two through six set forth above. Therefore, we will focus on facts bearing upon those factors in our analysis.

The record in this case indicates that 7 men and 14 women were examined for jury service prior to consideration of juror Gomez. Out of that group, five men and four women were excused for cause. Defendant used peremptory challenges to excuse one man and two women. The State exercised a peremptory challenge against one woman. Of the initial group of 21 venirepersons, one male was accepted for jury service, and seven women were selected by the parties. As the trial judge emphatically noted, the challenge defendant exercised against juror Gomez was the second challenge against an *African-American* female, and the third against a female generally. Counsel had previously objected, unsuccessfully, to the excusal of an Hispanic female for cause.

As we indicated in our prior opinion, the mere number of persons in a protected class who are peremptorily challenged, without more, will not establish a *prima facie* case of discrimination. *Rivera*, 221 Ill. 2d at 512, citing *People v. Heard*, 187 Ill. 2d 36, 56 (1999). The number of persons struck takes on meaning only when coupled with other information, such as the characteristics of the venire overall, the characteristics of others struck, and the answers of those who were not struck. *Rivera*, 221 Ill. 2d at 512, citing *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005). The unchallenged presence of jurors from the protected class on the seated jury is a

factor properly considered (*Rivera*, 221 Ill. 2d at 513, citing *People v. Brown*, 172 Ill. 2d 1, 35 (1996)) and tends to weaken the basis for a *prima facie* case of discrimination (*Rivera*, 221 Ill. 2d at 513, citing *Ochoa-Vasquez*, 428 F.3d at 1044-45). The party asserting a *Batson* claim has the burden of establishing a *prima facie* case and preserving the record. *Rivera*, 221 Ill. 2d at 512. As we held in our prior opinion, that burden falls upon a trial court when it acts *sua sponte. Rivera*, 221 Ill. 2d at 512.

The record in this case simply does not support the action taken by the trial court. Since women outnumbered men on the venire two to one, it would not be unusual, from a statistical standpoint, that defendant had used peremptory challenges against two women and one man prior to consideration of juror Gomez. Moreover, although defendant did not question Rosalee Huizenga–the second woman challenged–he *did* question Elizabeth Alexander–the first woman challenged–and he might well have decided to excuse her because her cousin was a police officer and she was about to get a degree in criminal justice. As far as juror Gomez is concerned, the fact that she had frequent contact with gunshot victims seems to us a valid reason why defense counsel might want to excuse her, and defense counsel's questioning reveals nothing of a discriminatory nature. If the trial judge saw something in counsel's demeanor or actions that led him to believe otherwise, he has not seen fit to make those observations a part of the record. The judge's reference to the "nature of the questions" counsel asked suggests that it was the *content* of the questions that concerned him. However, the questions asked of Gomez are a matter of record, and we see nothing in that questioning which would support a *prima facie* case of gender discrimination–or, for that matter, a case of *racial* discrimination.

The trial judge's statements during jury selection, frankly, suggested that he believed defense counsel was engaged in either racial discrimination or combined race-gender discrimination. Otherwise, why would the judge repeatedly emphasize that Gomez was *African-American*? If gender were the only consideration, there would be no reason to mention the juror's race. It simply is not relevant. It is interesting to note that the judge *still* felt obliged to mention the race of the parties and persons in the venire on remand,

-10-

when he was making a record to support a case for *gender* discrimination.

In any event, we find that the record fails to support a *prima facie* case of discrimination *of any kind*. Consequently, the defendant was improperly denied a peremptory challenge. The question, then, is whether reversal is required.

The parties cite legions of cases from other jurisdictions in support of their respective positions, the State arguing that the denial of the peremptory challenge is subject to harmless-error analysis, and the defendant arguing automatic reversal. We believe this issue can be resolved on the basis of precedents from this court and the United States Supreme Court, and our analysis will proceed accordingly.

As we noted in our prior opinion in this matter, the peremptory challenge has been described by the United States Supreme Court as " ' "one of the most important of the rights secured to the accused" ' " insofar as it eliminates " 'extremes of partiality on both sides.' " *Rivera*, 221 Ill. 2d at 496, quoting *Swain v. Alabama*, 380 U.S. 202, 219, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 835 (1965), quoting *Pointer v. United States*, 151 U.S. 396, 408, 38 L. Ed. 208, 214, 14 S. Ct. 410, 414 (1894). In Justice Scalia's majority opinion in *Holland v. Illinois*, 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803 (1990), he discussed the "venerable" history of the peremptory challenge, stating:

> "[T]hat device occupies 'an important position in our trial procedures,' *Batson*, 476 U.S., at 98, and has indeed been considered 'a necessary part of trial by jury,' *Swain v. Alabama*, 380 U.S., at 219. Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of 'eliminat[ing] extremes of partiality on both sides,' *ibid.*, thereby 'assuring the selection of a qualified *and unbiased jury*,' *Batson*, *supra*, at 91 (emphasis added)." *Holland*, 493 U.S. at 484, 107 L. Ed. 2d at 918-19, 110 S. Ct. at 809.

In his dissent in *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), Justice Scalia described the peremptory challenge as "a means of winnowing out possible (though not demonstrable) sympathies and antagonisms on both sides, to the end that the jury will be the fairest possible." *Powers*, 499 U.S. at 425, 113

L. Ed. 2d at 434-35, 111 S. Ct. at 1378 (Scalia, J., dissenting, joined by Rehnquist, C.J.). In its 1965 decision in *Swain*, the Supreme Court stated, in *dictum*, that the denial or impairment of the right to a peremptory challenge is "reversible error without a showing of prejudice." *Swain*, 380 U.S. at 219, 13 L. Ed. 2d at 772, 85 S. Ct. at 835.

Although various members of the Supreme Court continue to acknowledge the importance of peremptory challenges, after *Batson*, the status of the peremptory challenge underwent a gradual, but marked change, culminating in the Court's decision in *United States v. Martinez-Salazar*, 528 U.S. 304, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000), and it is now clear that the Supreme Court no longer considers peremptory challenges indispensable to a fair trial or their erroneous denial a matter necessarily requiring reversal.

We note, initially, that the passage from *Batson*, which Justice Scalia quoted in part in *Holland*, actually states that peremptory challenges are "*one* means of assuring the selection of a qualified and unbiased jury." (Emphasis added.) *Batson*, 476 U.S at 91, 90 L. Ed. 2d at 84, 106 S. Ct. at 1720. The qualification "one" suggests that the Court does not consider peremptory challenges the *only* means of assuring the selection of an impartial tribunal, nor, perhaps, a *necessary* means. The *Batson* Court reiterated that "the Constitution does not confer a right to peremptory challenges." *Batson*, 476 U.S at 91, 90 L. Ed. 2d at 84, 106 S. Ct. at 1720. In fact, the Court has long recognized that there is nothing in the Constitution of the United States which requires the granting of peremptory challenges in criminal cases. *Stilson v. United States*, 250 U.S. 583, 586, 63 L. Ed. 1154, 1156, 40 S. Ct. 28, 30 (1919).

In 2000, the Supreme Court rendered its decision in *United States v. Martinez-Salazar*, 528 U.S. 304, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000), the case that appears to have signaled the end of *Swain*'s automatic-reversal rule. In *Martinez-Salazar*, the Court first differentiated between the right to an impartial jury and the right to exercise peremptory challenges:

> "[W]e have long recognized *** that such challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of

federal constitutional dimension." *Martinez-Salazar*, 528 U.S. at 311, 145 L. Ed. 2d at 800, 120 S. Ct. at 779.

Noting its previous holding in *Ross v. Oklahoma*, 487 U.S. 81, 101 L. Ed. 2d 80, 108 S. Ct. 2273 (1988), a case in which a defendant was forced to exercise a peremptory challenge to cure a trial court's error in denying a challenge for cause, the Court stated, "without more, 'the loss of a peremptory challenge [does not] constitute[ ] a violation of the constitutional right to an impartial jury.' " *Martinez-Salazar*, 528 U.S. at 313, 145 L. Ed. 2d at 801, 120 S. Ct. at 780, quoting *Ross*, 487 U.S. at 88, 101 L. Ed. 2d at 90, 108 S. Ct. at 2278. In *Martinez-Salazar*, the Court went on to hold, specifically, that a defendant's exercise of peremptory challenges is *not* denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause. *Martinez-Salazar*, 528 U.S. at 317, 145 L. Ed. 2d at 804, 120 S. Ct. at 782. However, the most significant part of the Supreme Court's opinion for present purposes is set forth in a footnote. As the briefs in this case indicate, that footnote has caused courts across the country to reexamine the automatic-reversal rule of *Swain*. That footnote states as follows:

> "Relying on language in *Swain v. Alabama*, 380 U.S. 202 (1965), as did the Court of Appeals in the decision below, Martinez-Salazar urges the Court to adopt a remedy of automatic reversal whenever a defendant's right to a certain number of peremptory challenges is substantially impaired. Brief for Respondent 29 (a ' "denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice" ') (quoting *Swain*, 380 U.S., at 219). Because we find no impairment, we do not decide in this case what the appropriate remedy for a substantial impairment would be. We note, however, that the oft-quoted language in *Swain* was not only unnecessary to the decision in that case–because *Swain* did not address any claim that a defendant had been denied a peremptory challenge–but was founded on a series of our early cases decided long before the adoption of harmless-error review." *Martinez-Salazar*, 528 U.S. at 317 n.4, 145 L. Ed. 2d at 804 n.4, 120 S. Ct. at 782 n.4.

Thus, in *Martinez-Salazar*, the Court clearly took issue with *Swain*'s suggestion that the erroneous denial or impairment of the right to

exercise a peremptory challenge requires automatic reversal, characterizing that assertion as *dictum*, and signaling that legal proposition is no longer good law in the age of "harmless-error review."

We observe that the footnote purports to address only "a remedy of automatic reversal whenever *** *a certain number* of peremptory challenges is substantially impaired." (Emphasis added.) *Martinez-Salazar*, 528 U.S. at 317 n.4, 145 L. Ed. 2d at 804 n.4, 120 S. Ct. at 782 n.4. Obviously, in our situation, the question at hand concerns the appropriate remedy when a defendant seeks to exercise a peremptory challenge against a *specific* juror, and the challenge is disallowed. However, the distinction appears to be one without a difference insofar as the "oft-quoted language in *Swain*," to which the Court referred, broadly encompasses any " ' "denial or impairment of the right [to exercise peremptory challenges]." ' " *Martinez-Salazar*, 528 U.S. at 317 n.4, 145 L. Ed. 2d at 804 n.4, 120 S. Ct. at 782 n.4, quoting *Swain*, 380 U.S. at 219, 13 L. Ed. 2d at 772, 85 S. Ct. at 835. Moreover, the denial of "a certain number" of peremptory challenges is not significantly different from the denial of a peremptory challenge against a *specific* juror. In the former instance, a party is denied the opportunity to excuse a juror whom he suspects harbors some bias, though he cannot prove it; the same is true in the latter instance. Thus, we believe the observation in the footnote applies to the circumstances presently before this court.

Defendant argues that we should not find that the *Martinez-Salazar* footnote "impliedly overruled the automatic reversal rule." We see nothing "implied" in the language the Supreme Court employed. The Court undermined the validity of *Swain*'s automatic-reversal rule on two fronts: it was *dictum* and the rule was espoused before the advent of harmless-error review. We believe the meaning of the *Martinez-Salazar* footnote is explicit.

Of course, harmless-error review would not apply to an error considered "structural" in nature. However, the error in question would not seem to qualify as a "structural error." While the Supreme Court has recognized a number of "structural errors" requiring automatic reversal (see *Washington v. Recuenco*, 548 U.S. __, __ n.2, 165 L. Ed. 2d 466, 474 n.2, 126 S. Ct. 2546, 2551 n.2 (2006)), including trial before a biased trial judge (*Tumey v. Ohio*, 273 U.S.

510, 71 L. Ed. 749, 47 S. Ct. 437 (1927)), the erroneous denial of a peremptory challenge has not been included in that list. In *Recuenco*, the Court noted: "Only in rare cases has this Court held that an error is structural, and thus requires automatic reversal. In such cases, the error 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *Recuenco*, 548 U.S. at __, 165 L. Ed. 2d at 474, 126 S. Ct. at 2551. As the Court stated in *Recuenco*: " ' "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." ' " *Recuenco*, 548 U.S. at __, 165 L. Ed. 2d at 474, 126 S. Ct. at 2551, quoting *Neder v. United States*, 527 U.S. 1, 8, 144 L. Ed. 2d 35, 46, 119 S. Ct. 1827, 1833 (1999), quoting *Rose v. Clark*, 478 U.S. 570, 579, 92 L. Ed. 2d 460, 471, 106 S. Ct. 3101, 3106 (1986). While trial before a biased tribunal *would* deprive a defendant of a substantial right and constitute structural error (see *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437 (1927)), there is no evidence that defendant was tried before a biased jury, or even *one* biased juror. He does not suggest that Gomez was subject to excusal for cause. Thus, we do not see the error as one fitting within the Supreme Court's framework of "structural errors." Nor can a "substantial right" be implicated, as the Supreme Court considers harmless-error review applicable.

Defendant argues that harmless-error analysis cannot apply here because "Gomez's presence on the jury cannot be qualitatively assessed for harm." We disagree. The Supreme Court's decision in *Neder*, and our recent decisions in *People v. Thurow*, 203 Ill. 2d 352 (2003), and *People v. Nitz*, 219 Ill. 2d 400 (2006), illustrate the error in defendant's position.

In *Neder*, the Supreme Court held the omission of an element of the charged offense from a jury instruction falls into the category of errors amenable to harmless-error review. The Court observed:

> "Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (Emphasis in original.) *Neder*, 527 U.S. at 9, 144 L. Ed. 2d at 47, 119 S. Ct. at 1833.

-15-

The Court went on to enunciate the test for determining whether a constitutional error is harmless: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder*, 527 U.S. at 18, 144 L. Ed. 2d at 53, 119 S. Ct. at 1838.

In *People v. Thurow*, 203 Ill. 2d 352 (2003), relying upon the Supreme Court's opinion in *Neder*, this court held that *Apprendi* violations are subject to harmless-error analysis. In *Thurow*, as in *Nitz*, a *judge* found an element necessary for sentence enhancement when a *jury* should have been charged with that determination. In *Thurow*, this court found the *Apprendi* violation harmless, stating:

> "Given the evidence in support of this element, it is clear beyond a reasonable doubt that a properly instructed, rational jury would have found defendant guilty of involuntary manslaughter against a household member. We therefore conclude that the failure to instruct the jury as to this element was harmless error." *Thurow*, 203 Ill. 2d at 369.

In *Nitz*, we were called upon to address the appellate court's deviant application of harmless-error analysis to an *Apprendi* violation. We noted:

> "In applying that analysis *** the appellate court determined that it should not use an objective standard when determining whether a jury would have found defendant's crime to be brutal and heinous. 353 Ill. App. 3d at 1002. Rather, it concluded that defendant 'was constitutionally entitled to have each element of his guilt decided beyond a reasonable doubt by a *jury of his choosing*.' (Emphasis in original.) 353 Ill. App. 3d at 1003. Thus, the appellate court considered 'what Nitz's jury, not some hypothetical jury, would have decided had it been allowed to decide.' 353 Ill. App. 3d at 1003." *Nitz*, 219 Ill. 2d at 407-08.

We rejected the appellate court's subjective jury analysis, stating, "*Thurow* establishes that an appellate court reviewing an *Apprendi* error must examine the evidence and determine what a rational jury would have found. *** [T]he appellate court in this case erred when it failed to examine the evidence presented at trial and instead

-16-

attempted to divine the thoughts of the 12 jurors who heard that evidence." *Nitz*, 219 Ill. 2d at 413-14.

Contrary to defendant's argument otherwise, it may in fact be possible to qualitatively assess for harm Gomez's presence on the jury, by applying the rational juror standard to the evidence adduced against defendant. If the evidence is so overwhelming that no rational jury–or juror–would have acquitted defendant of the offense, then Gomez's presence on the jury cannot be said to have prejudiced him. Thus, we consider the evidence adduced in this case.

The State presented evidence that defendant shot and killed 16-year-old Marcus Lee, erroneously believing that Lee was a member of a rival gang. At trial, the State called Susan Shelton, Miguel Rodriquez, and Charles Oberlin to testify regarding the events of January 10, 1998, the night of the murder. All three witnesses were former members of defendant's gang, the Insane Deuces.

Susan Shelton testified that she was with the defendant on the night of the murder. That evening, Shelton attended a party where defendant and several other members of the Insane Deuces were also in attendance. At some point in the evening, defendant, Shelton, Carlos Sanchez (also a gang member), and three others left the party in Sanchez's van, with Sanchez driving. While they were driving around defendant saw two persons walking down the street. Defendant identified those individuals as members of a rival gang. Defendant directed Sanchez to stop the van. Defendant then produced a gun and exited the van, but returned a few seconds later, instructing Sanchez to chase the two persons they had just seen. Shelton testified that they never saw those two individuals again that night, but defendant later noticed another individual on the street, and announced, "There go [*sic*] that pussy ass Stone from earlier." Shelton knew that the Insane Deuces and the Stones were rival gangs.

Defendant pointed his gun at Sanchez and ordered him to "stop the fucking van." When the van stopped, defendant exited the van, still holding the gun. Two other occupants followed. Defendant ran around the side of the van, and out of Shelton's sight. Shelton then heard gunshots. Defendant and the others returned to the van, with defendant still holding the gun. The two other individuals with defendant were yelling gang slogans until defendant told them to "shut the fuck up," advising them that he still had "one bullet left."

-17-

Defendant was the only person Shelton saw armed with a weapon that evening. After the shooting, defendant continued to direct the van's movements. At one point, defendant ordered Sanchez to stop in an alley. Defendant unloaded the gun and handed the shell casings to Shelton. Defendant got out of the van with the gun and later returned without it. Shelton gave the shell casings to Sanchez, and he apparently disposed of them. Sanchez then took defendant and three other individuals back to the party. Shelton testified that she believed defendant to be the "chief enforcer" of the Insane Deuces, a gang position below the chief, or "jefe," and above the foot soldiers.

Miguel Rodriguez testified that he was a member of the Insane Deuces on January 9, 1998, and several members of the gang–including defendant–were at his home that evening. Between 8:30 and 9 p.m. that night, the group was notified that there were some "Stones" in a park near Rodriguez's home. The group, including defendant and a person named "Nelson," went to the park, where they saw some individuals playing basketball. Defendant began to "throw" gang signs, indicating his allegiance to the gang. When those playing basketball did not respond, the group returned to Rodriguez's home.

Back at Rodriguez's home, defendant referred to the individuals in the park as "pussies" because they were afraid to fight. Later that night, Rodriguez observed defendant in possession of two chrome revolvers. Thereafter, defendant began asking other gang members if they wanted to go with him to the projects. Defendant and other members of the gang left Rodriguez's home between 12:30 and 1 a.m. When Rodriguez next saw defendant it was approximately 3 a.m. At that time, defendant announced to Rodriguez that he was a "Stone killer," and he indicated he had shot someone that evening. Rodriguez identified Nelson as a "chief" of the gang, and defendant as the "chief enforcer." He explained that the role of the chief enforcer was to enforce the chief's decisions.

Charles Oberlin testified that he was a member of the Insane Deuces in January of 1998, and he knew defendant as the "chief enforcer" of that gang. Around 3 or 4 a.m. on January 10, 1998, Oberlin saw defendant in possession of a chrome gun, and defendant indicated that he had fired the weapon. Oberlin described his own position in the gang hierarchy at the time as that of an "old-G," or elder. Oberlin explained that his position was above that of "foot

soldiers," but below the chief enforcers, the chief and the vice-president.

After the State rested, defendant proceeded by stipulation. It was stipulated that on January 15, 1998, Oberlin had testified before the grand jury that the last time he saw defendant with a gun was at a laundromat on Belmont on January 8, 1998. Further, it was stipulated that Rodriguez had testified before the grand jury that he did not see an individual named Masina give defendant the handguns, but only saw defendant with the handguns. Further, it was stipulated that Rodriquez gave grand jury testimony indicating that when defendant was explaining how he shot the victim, defendant stated that the victim grabbed his chest, screamed, fell, and never got back up. Finally, it was stipulated that Susan Shelton had testified before the grand jury on January 12, 1998. Shelton testified that, when she was in the van on the evening in question, she heard a gunshot and she then put her head down and closed her eyes, whereafter she heard four more gunshots.

The defense rested without presenting any witnesses.

During closing argument, the prosecutor argued, *inter alia*, that defendant was the "chief enforcer" of the Insane Deuces and killed Marcus Lee because he thought Lee was "a Stone." The jury, comprised of 11 unobjectionable jurors and Gomez, found defendant guilty of first degree murder on this evidence.

At a subsequent hearing, the circuit court denied defendant's posttrial motion and proceeded to sentencing. The State argued that an extended-term sentence was warranted because the murder was committed in a brutal and heinous manner indicative of wanton cruelty (see 730 ILCS 5/5–5–3.2(b)(2) (West 1998)) and because defendant was a leader in the Insane Deuces street gang and the murder was related to the gang's activities (see 730 ILCS 5/5–5–3.2(b)(8) (West 1998)). Defense counsel argued that the murder was not committed in a brutal and heinous manner and, though all the witnesses referred to defendant as the "chief enforcer" of the gang, "it was not clearly shown that defendant was a leader, motivator or supervisor" of the gang. The circuit court determined that an extended-term sentence was warranted, stating:

"I further find that [defendant] was indeed a chief enforcer of the Insane Deuces gang, *** and a weapon was obtained at his direction and a search for rival gang members was then had."

Continuing, the court concluded, "It was a senseless, brutal killing and I feel that under the circumstances this was a gang incident, gang motivated at the direction of this defendant." The circuit court apparently accepted the State's contention–now discredited– that the principles of *Apprendi* do not apply because the sentencing range for first degree murder is "twenty to death by lethal injection." See *People v. Swift*, 202 Ill. 2d 378, 392 (2002) (sentencing range for first degree murder in Illinois is 20 to 60 years' imprisonment). The circuit court sentenced defendant to an extended-term sentence of 85 years in the Illinois Department of Corrections.

Thereafter, defendant filed a motion to reconsider sentence. At the hearing on that motion, defense counsel argued that *Apprendi* requires *a jury* to find the factors enabling the imposition of an extended-term sentence. Counsel also argued that defendant was not in a leadership position within the gang, as required by the statute, because his place in the gang hierarchy places him below "the chief" and required him to carry out the chief's orders. The circuit court persisted in its prior ruling and denied the motion for reconsideration.

We believe any rational trier of fact would have found defendant guilty of murder on the evidence adduced at trial. Any inconsistencies in the witnesses' grand jury testimony were insignificant when compared to their compelling trial testimony, consistently implicating defendant as the perpetrator of the murder. The evidence of defendant's guilt is overwhelming, and the error in denying defendant's peremptory challenge is thus harmless beyond a reasonable doubt. Since that is the case, we need not decide whether the erroneous denial of a peremptory challenge is an error of constitutional dimension in these circumstances.

Further, applying the analyses of *Neder*, *Nitz* and *Thurow* to defendant's *Apprendi* issue, we find the *Apprendi* violation harmless beyond a reasonable doubt. Section 5–5–3.2(b)(8) of the Unified Code of Corrections (730 ILCS 5/5–5–3.2(b)(8) (West 1998)) authorized an extended-term sentence:

"When a defendant is convicted of a felony other than conspiracy and the court finds that the felony was committed under an agreement with 2 or more other persons to commit that offense and the defendant, with respect to the other individuals, occupied a position of organizer, supervisor, financier, or any other position of management or leadership, and the court further finds that the felony committed was related to or in furtherance of the criminal activities of an organized gang or was motivated by the defendant's leadership in an organized gang[.]" 730 ILCS 5/5–5–3.2(b)(8) (West 1998).

Clearly, this murder was gang related and involved the participation and agreement of defendant and two or more other persons. The uncontradicted evidence indicates that defendant held a leadership position in the gang and the murder was motivated by defendant's leadership position. The error in not submitting the enhancement issue to a jury is harmless beyond a reasonable doubt.

Finally, defendant contends that the imposition of an extended-term sentence in this case violated his right to a jury trial as guaranteed by the *Illinois* constitution. He suggests that this right is broader than that guaranteed by the federal constitution and such a violation is not subject to a harmless-error analysis. Defendant's argument is interesting insofar as it begins with the relatively new federal rule of procedure announced in *Apprendi*–a rule which we had never recognized as required by *our* state constitution–and not only assumes we would find such a requirement in Illinois' constitution, but also urges us to hold that its violation is not amenable to harmless-error analysis.

In fact, an examination of our decisions over the decades suggests no such requirement. With the exception of death penalty cases, the longstanding procedure in Illinois has been for *judges* to make sentencing determinations, including the finding of facts necessary to support the sentences. Multitudes of such cases predate the 1970 Illinois constitution, and we have to assume the framers were aware of them. Thus, when the defendant cites article I, section 13, of the Illinois Constitution, wherein it is stated that "[t]he right of trial by jury as *heretofore* enjoyed shall remain inviolate" (emphasis added) (Ill. Const. 1970, art. I, §13), the right of which he speaks was

-21-

apparently not one which included jury participation in the sentencing phase of noncapital cases.

This court, in *People v. Adkins*, 41 Ill. 2d 297 (1968), made it clear that sentencing in noncapital cases was a procedure distinct from the adversary proceeding of a jury trial, and with different evidentiary rules and standards:

> "In Illinois, *** we have long held that the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the adversary circumstances of a trial." *Adkins*, 41 Ill. 2d at 300.

The rules did not change with the advent of extended-term sentencing in the early 1970s. In *People v. La Pointe*, 88 Ill. 2d 482 (1981), a case involving extended-term sentencing, this court quoted the Supreme Court itself in differentiating between the evidentiary rules then applicable to *trial* procedures and *sentencing* procedures: " 'In addition to the historical basis for different evidentiary rules governing trial and sentencing procedures there are sound practical reasons for the distinction.' " *La Pointe*, 88 Ill. 2d at 496, quoting *Williams v. New York*, 337 U.S. 241, 246-51, 93 L. Ed. 1337, 1342-44, 69 S. Ct. 1079, 1083-85 (1949). Relevance and reliability were the touchstones for admissibility (*People v. Fern*, 189 Ill. 2d 48, 67 (1999)), and the reasonable doubt standard that emerged from *Apprendi* was not a part of noncapital sentencing in this state prior to that decision; nor was the requirement that the *trier of fact* make findings pertinent to sentencing.

In *La Pointe*, this court considered the constitutionality of one of the very enhancement factors argued by the State in this case. In *La Pointe*, defendant challenged the constitutionality of section 5–8–1(a)(1) (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005–8–1(a)(1)), which authorized natural life imprisonment when "the court" found a defendant's conduct to be "exceptionally brutal or heinous behavior indicative of wanton cruelty." *La Pointe*, 88 Ill. 2d at 499. Defendant argued that the statute was unconstitutionally vague and therefore violated due process requirements; he also argued that the felony sentencing scheme, which offered the prospect of release to every offender sentenced to a term of imprisonment excepting a small class of murder defendants, violated equal protection of the law. *La Pointe*,

88 Ill. 2d at 499. It likely never occurred to him, or any other defendants, or the legislature, that a *sentencing court* could not, constitutionally, make findings bearing upon sentence enhancement. The only requirement was that the court advise the defendant, initially, of the possible sentences he could face, including extended-term sentences, upon proof of certain aggravating facts.

In response to *Apprendi*, the Illinois legislature changed section 1005–8–1(a)(1) to require the "trier of fact" to find an enhancement factor "beyond a reasonable doubt." See 730 ILCS 5/5–8–1(a)(1) (West 2000). The legislature clearly felt no need to make those changes prior to the Supreme Court's decision in *Apprendi*, because it was taken for granted that the *judge* was the sentencing fact finder in noncapital cases prior thereto.

We have considered defendant's extensive argument on this issue, and we reject his contention that the Illinois constitution affords rights beyond its federal counterpart in this respect. We see no appreciable difference between the rights guaranteed by the federal and state constitutions. As we noted recently in *People v. Taylor*, 221 Ill. 2d 157, 169 (2006):

> "Both our federal and state constitutions preclude a criminal felony conviction without the right to a jury trial. Specifically, the sixth amendment to the United States Constitution states that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.' U.S. Const., amend. VI. Similarly, our state constitution provides that '[i]n criminal prosecutions, the accused shall have the right *** to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed.' Ill. Const. 1970, art. I, §8."

Although the harmless-error analysis we used in *Thurow* was based on United States Supreme Court precedents interpreting the right to a jury trial guaranteed by the *federal* constitution, we find nothing in our own constitution, or our precedents, which would cause us to interpret the Illinois constitution differently. Therefore, assuming, *arguendo*, that the Illinois constitution requires a "trier of fact" to make findings bearing upon sentence enhancement "beyond a reasonable doubt," we conclude that any violation of the right to a

jury trial guaranteed by the Illinois constitution was harmless for the same reasons discussed in *Thurow*.

For the foregoing reasons, we affirm the judgment of the appellate court–though not the entirety of its analysis–insofar as that judgment affirmed the judgment of the circuit court.

*Affirmed.*