Docket No. 108909.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. IRA MULLINS, Appellee.

*Opinion filed April 21, 2011.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justice Burke concurred in the judgment and opinion.

Chief Justice Kilbride specially concurred, with opinion.

Justice Garman specially concurred, with opinion, joined by Justices Thomas, Karmeier, and Theis.

## OPINION

After a jury trial, defendant, Ira Mullins, was convicted of possession of a controlled substance with intent to deliver (720 ILCS 570/401(d) (West 2004)), and sentenced to nine years in prison. The appellate court reversed and remanded for a new trial. We granted the State's petition for leave to appeal and now reverse the judgment of the appellate court.

## BACKGROUND

Defendant was charged with possession of a controlled substance

with intent to deliver (720 ILCS 570/401(d) (West 2005)). Prior to trial, defense counsel moved *in limine* to bar the State from using defendant's three prior felony narcotics convictions[1] as impeachment should he testify. In response, the State asked that the court "withhold judgment as to whether [the convictions are] more prejudicial than probative if and when the defendant does actually testify." The court agreed, ruling it would reserve its decision.

At trial, Chicago police officer Matt McGrory testified that at about 11 p.m. on February 1, 2005, he and his partner, Jeffrey Zwit, were part of a narcotics surveillance operation near the 4500 block of West Washington Boulevard, an area known for narcotics transactions. McGrory was stationed on the rooftop of a three-flat residence at 4451 West Washington Boulevard, while the other officers waited in two marked squad cars about a block away. Using binoculars, McGrory observed defendant standing alone on the sidewalk in front of 4506 West Washington Boulevard, a residence with a wire fence encircling the front of the property. The area in which defendant was standing was "well-lit" by street lights, and he was approximately 10 feet away from one of these lights.

McGrory observed a man approach defendant and engage him in brief conversation. The man then handed defendant an item which defendant shoved into his pants pocket. Based upon the size and tint of the paper, McGrory believed defendant had accepted money, but he could not discern the denomination of the bills. Defendant walked over to a nearby metal fence post and retrieved an unknown object from inside that post. Defendant then gave the object to the man who had given him the money. Although McGrory could not exactly determine what the item was, he saw it was the size of a coin. The other person then left on foot. This same series of events occurred twice more, within the span of a few minutes. Based upon his experience and training, McGrory believed he was observing illegal narcotics transactions.

McGrory conducted this surveillance for approximately 30 minutes, during which time he was in contact with Zwit and the

---

[1]Defendant's most recent conviction occurred in 2001, with the two other convictions occurring in 1997.

backup officers by two-way radio. After witnessing the third transaction, McGrory gave his colleagues a description of defendant and asked that they approach and detain him. McGrory maintained his surveillance as the other officers drove to defendant's location. While the two backup officers detained defendant, McGrory directed Zwit via the police radio to the fence post from which defendant had retrieved the objects. After he observed Zwit recover items from the post, McGrory joined the others at the scene, where defendant was arrested. McGrory testified that during the surveillance period, defendant had no bags or suitcases with him. In addition, McGrory never saw defendant walk into 4506 West Washington Boulevard and never saw anyone come out of that house.

McGrory and Zwit transported defendant to the police station, where Zwit showed McGrory the plastic bag he had retrieved from the fence post. The bag contained three tinfoil packets of white powder. McGrory then processed defendant and asked for his address. Defendant stated that he resided at 210 North Central in Chicago.

On cross-examination, McGrory was asked why his written arrest report failed to include several facts to which he testified during direct examination: that he used binoculars during the surveillance operation; that the fence post had no cap; that defendant stood 10 feet away from the street light; and that defendant placed something in his pocket after every transaction. McGrory acknowledged that he did not include these specific facts, but explained that the purpose of the written report is to summarize the incident and, therefore, not every fact is included.

Officer Zwit's testimony largely mirrored that of McGrory regarding the initiation and execution of the surveillance operation. Zwit additionally testified that he and the two backup officers did not personally witness the three transactions, because they were stationed around the corner waiting for McGrory to give the signal to move to the scene. When they did, McGrory directed him to look inside the fence post, which was hollow. Zwit found a plastic bag inside the post that contained three tinfoil packets of white powder suspected to be heroin. The plastic bag was held up inside the post by "random garbage," including chip bags and other debris. From his experience with narcotics investigations, Zwit recognized the tinfoil packets as those commonly used in the individual sale of heroin. The packets

resembled items commonly referred to as "nickel" bags worth $5, in contrast to larger packets typically sold for $10. Zwit transported the three packets back to the station, where he inventoried them. Zwit also inventoried $18 in United States currency given to him by one of the backup surveillance officers who had recovered the money from defendant's pockets. The currency consisted of three $5 bills and three $1 bills. No narcotics were recovered from defendant's person.

Officer Almanza also took part in the surveillance operation, and his testimony corroborated that of McGrory and Zwit. Almanza additionally stated that, at the scene, he conducted a protective patdown of defendant and found nothing illegal. He did notice, however, that defendant had money in his pockets, which was retrieved during the later custodial search of defendant at the station. Almanza recovered $18 from defendant, consisting of three $5 bills and three $1 bills. Each individual bill was crumpled up and stuffed in defendant's pockets. According to Almanza, "[u]sually what happens in narcotics when we *** arrest people, they just grab money from the buyer and they just shove it into their pocket immediately."

Dr. Monica Kinslow, a forensic chemist employed by the Illinois State Police, testified that she tested the substance in the foil packets retrieved from the fence post and determined it was heroin. She further determined that the weight for one packet was 0.1 grams, and, therefore, that the total weight of the three packets was 0.3 grams. The State then rested.

After the trial court denied defendant's motion for a directed verdict, defendant called Trenton Grayer to testify on his behalf. Grayer was 15 years old at the time of trial, and 14 at the time of this incident. Grayer was a "good friend" of defendant and knew him for approximately three years as a result of working together at a Chicago car wash. Grayer sometimes saw defendant socially on the weekends, but they had not been to each other's homes. Grayer did not have defendant's phone number, but defendant had his.

Grayer stated that on February 1, 2005, defendant called Chiquita Chambers–another coworker from the car wash–and said he was returning to Chicago from Detroit. Grayer could not recall if February 1 was a weekday or weekend, nor whether he had attended school that day. Grayer accompanied Chambers in her car to pick defendant up at a bus station in downtown Chicago at around 8:15 p.m.

Defendant got in the back of Chambers' car with his bags, and the trio returned to Chicago's west side, where they "just drove around" and talked for about two to three hours. According to Grayer, the group had no specific destination and they made no stops during that period.

Eventually, Chambers became tired, and defendant asked to be driven to a hotel. Grayer could not remember the hotel's name, but recalled that it was on West Washington Boulevard. When they arrived, defendant asked Chambers for money, and she gave defendant $12, in the form of one $10 bill and two $1 bills. Defendant got out of the car with his bags, and Grayer and Chambers drove away. Grayer stated they dropped defendant off at the hotel at 11:15 p.m., and that he knew the exact time because he looked at a cell phone. Grayer did not see defendant enter the hotel and did not know where defendant went after he left the car. Chambers and Grayer were a few blocks away from the hotel when defendant called Chambers to tell her he did not have enough money to rent a room. Chambers and Grayer drove back to the hotel, but they did not see defendant or anyone else on the street. When asked how long it was after they dropped defendant off that they returned to the hotel, Grayer responded "ten, fifteen, maybe five [minutes], I really don't know." The pair neither went into the hotel to look for defendant, nor called him on his phone. Instead, they left.

Defendant testified that he was 27 years old and worked at a Chicago car wash with both Grayer and Chambers for between three and four years. On February 1, he returned to Chicago from Detroit, where he had lived for nearly one year with his fiancée and son. When Grayer and Chambers picked him up at the bus station, he had between $25 and $30 in cash, and offered to buy something to drink at a liquor store. Defendant spent $20 on a pint of liquor, and he and Chambers "drank a little bit" while the trio "rode around" for between 2 and 2½ hours. During this period, the group stopped at various times so that defendant could visit several people, including his god brother and a few other friends.

At about 11:10 p.m., Chambers told defendant she was tired of driving, and he asked her to drop him off at a hotel near the 4500 block of West Washington Boulevard. He also asked her for money, and she gave him $12, after which he had a total of $18 cash. Defendant stated he did not know the denomination of the bills

Chambers gave him. He then went into the hotel and asked to rent a room for four hours. Defendant decided to stay for only that short period because "it was already late that night," even though he was "not sure" where he would have gone after leaving the hotel. Defendant was told the room cost $24, plus an additional $3 deposit for the room key. Because he was short of money, he called Chambers to ask for more. She agreed and stated she would drive back to meet him.

Defendant left the hotel at 11:20 p.m.; he stated he knew the precise time because he had looked at his watch. As he stood on the sidewalk, he saw his friend "West" come out of 4506 West Washington, which was across the street. Defendant knew this person only as "West" and was not aware of his full name. Defendant was surprised to see West, whom he last saw in 1999. West beckoned defendant across the street, and then asked him what he was doing because he saw him with his luggage. Defendant told West he was trying to rent a room at the hotel, and West invited him to stay at his house. West then asked defendant if he was too intoxicated to drink, and defendant said no. Defendant and West spoke outside for three to five minutes before West took defendant's luggage into the house, and told him he would return with money to go to the liquor store.

While defendant was waiting for West in the yard in front of 4506 West Washington, the police pulled up in two cars, told him to "come here," and, when he did, they searched him and asked "where the guns and drugs were." Defendant was then handcuffed, placed in a squad car, and taken to the police station. Defendant denied selling drugs.

Defendant stated that he had tried to find West so that he could testify for him at trial, but West was "locked up" and defendant could not locate him. Defendant also stated that Chambers was unable to testify on his behalf because she had missed work to come to court the prior day, and could not miss work again.

On cross-examination, defendant stated for the first time that West came out on the porch of his house while defendant was being arrested, and that police "told him to get back into the house." Defendant also offered on cross-examination that he "started to get smart" with the officers when they repeatedly asked him the same questions. Defendant then rested.

At the conclusion of testimony, a side bar was held outside the presence of the jury regarding the court's deferred ruling on defendant's motion *in limine* to bar use for impeachment purposes of his three prior felony convictions for possession of a controlled substance with intent to deliver. After both parties presented arguments regarding the probative value and prejudicial effects of the prior convictions, the court admitted defendant's 2001 conviction for possession of a controlled substance with intent to deliver and barred introduction of defendant's two earlier convictions. The parties agreed to present this information to the jury by stipulation during the State's rebuttal case. Immediately after the side bar, the prosecutor read the following stipulation to the jury: "It is hereby stipulated by and between the parties that [defendant] has been convicted of possession of a controlled substance with intent to deliver under Case Number 01 CR 12360."

The State then recalled Officer Almanza. He testified that at the time defendant was placed under arrest, no one came out of 4506 West Washington.

After argument, the court instructed the jury, *inter alia*, that "[a]ny evidence that was received for a limited purpose should not be considered by you for any other purpose." The jury also received Illinois Pattern Jury Instruction (IPI) 3.13, which states that "[e]vidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness, and must not be considered by you as evidence of his guilt of the offense with which he is charged."

The jury began its deliberations at 5:36 p.m. At 6:42 p.m., the jury sent a note to the court, requesting a copy of the police report and of "the testimony read by [the] prosecuting attorney before closing arguments." By agreement of the parties, the court answered the first question by noting that because the police report was not entered into evidence, the jury could not have it during deliberations. As to the jury's second question, the court and the parties sent a return note asking for clarification. The jury sent a response at 6:58 p.m., stating: "We would like a copy of the testimony that was read by the prosecuting attorney after they came back from the sidebar and before Officer Almanza was recalled to the stand. It pertains to a prior conviction." The jury was brought back into the courtroom for the

court reporter to read the stipulation, and then continued deliberations. At 7:15 p.m., the jury returned a guilty verdict against defendant.

The appellate court affirmed. No. 1–06–1326 (unpublished order under Supreme Court Rule 23). The panel held that the trial court properly exercised its discretion in delaying its ruling on defendant's motion *in limine* because it did not have sufficient information to make a ruling before he testified. In addition, the court rejected defendant's argument that the trial court failed to perform the balancing test required under *People v. Montgomery*, 47 Ill. 2d 510 (1971), prior to admitting defendant's previous conviction for possession of a controlled substance with intent to deliver. The appellate court found that the trial court "conducted a thoughtful balancing under *Montgomery"* and properly admitted defendant's prior conviction for impeachment purposes.

Thereafter, defendant filed a petition for leave to appeal to this court. Although we denied defendant's petition, pursuant to our supervisory authority we directed the appellate court to reconsider its ruling in light of *People v. Patrick*, 233 Ill. 2d 62 (2009), filed during the pendency of this appeal. The appellate court vacated its original order, reversed defendant's conviction and remanded for a new trial. No. 1–06–1326 (unpublished order under Supreme Court Rule 23). The panel held that, like in *Patrick*, the trial court in the instant cause erred in delaying its ruling on the motion *in limine* until after defendant testified. Further, the panel determined that this error was not harmless "for the same reasons" stated in *Patrick*. The panel expressed no opinion regarding defendant's *Montgomery* argument.

We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010).

ANALYSIS

The State acknowledges that under our decision in *People v. Patrick*, 233 Ill. 2d 62 (2009), the trial court committed error in delaying its ruling on defendant's motion *in limine* to exclude his prior convictions from use as impeachment until after he testified. Accordingly, the State does not challenge that portion of the appellate court judgment holding that the trial court abused its discretion in

deferring its ruling on defendant's motion.

The narrow issue presented by this appeal is whether the error committed by the trial court was harmless or reversible. The State contends that the appellate court misconstrued *Patrick* and failed to conduct an appropriate harmless-error analysis. In the State's view, the appellate court improperly treated the trial court's error as a *de facto* structural error which affected the integrity of the trial and required automatic reversal of defendant's conviction without any showing of prejudice. The State posits that if the appellate panel had engaged in the correct analysis, it would have concluded that, under the facts presented, the trial court's error was harmless and did not require reversal.

Defendant counters that *Patrick* established that the proper analysis is whether the trial court's error in delaying the ruling on defendant's motion *in limine* was harmless beyond a reasonable doubt. Applying this test, defendant maintains that the error here was not harmless, and, therefore, the judgment of the appellate court should be affirmed. In addition, defendant also requests cross-relief, arguing that the trial court erred in admitting his prior conviction for purposes of impeachment. We reject defendant's contentions.

### A. Admission of Defendant's Conviction

Our inquiry necessarily begins with an examination of whether defendant's prior conviction was properly admitted for purposes of impeachment. In his request for cross-relief, defendant challenges the admission of his prior conviction for impeachment purposes, contending that the trial court erred in failing to conduct the required analysis under *People v. Montgomery*, 47 Ill. 2d 510 (1971), and that the appellate court erred when it rejected this argument in its initial order in this case. Because our inquiry need proceed no further if the trial court improperly admitted defendant's prior conviction, we address defendant's cross-relief request as a threshold matter.

In *Montgomery*, this court held that evidence of a witness' prior conviction is admissible to attack the witness' credibility where: (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment; (2) less than 10 years has elapsed since the date of

conviction of the prior crime or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. This last factor requires a trial judge to conduct a balancing test, weighing the prior conviction's probative value against its potential prejudice.

*Montgomery* further explained that in performing this balancing test, the trial court should consider, *inter alia*, the nature of the prior conviction, the nearness or remoteness of that crime to the present charge, the subsequent career of the person, the length of the witness' criminal record, and whether the crime was similar to the one charged. *Montgomery*, 47 Ill. 2d at 518. If the trial court determines that the prejudice substantially outweighs the probative value of admitting the evidence, then the evidence of the prior conviction must be excluded. *Montgomery*, 47 Ill. 2d at 518. The determination of whether a witness' prior conviction is admissible for purposes of impeachment is within the sound discretion of the trial court. *Montgomery*, 47 Ill. 2d at 517-18.

In his request for cross-relief, defendant contends that the trial court abused its discretion in failing to perform the *Montgomery* balancing test, instead treating defendant's prior conviction of possession of a controlled substance with intent to deliver as "automatically admissible" for purposes of impeachment, despite the probative value of that evidence being outweighed by its prejudicial effect. Defendant asserts that there is "no connection" between defendant's credibility as a witness and his prior conviction, and allowing the State to impeach him with a prior conviction for the same offense for which he was on trial "created an inevitable pressure on the jurors" to believe that defendant had a propensity to commit this same crime, thus tipping the scales in what defendant contends was a closely balanced case. We reject defendant's argument.

We find guidance in *People v. Atkinson*, 186 Ill. 2d 450, 458 (1999), in which we held that the trial court did not abuse its discretion in holding that evidence of the defendant's two prior convictions for burglary could be admitted for purposes of impeachment during the defendant's burglary trial. We explained that in adopting the three-prong analysis in *Montgomery*, we "recognized the importance of balancing a defendant's interest against unfair

-10-

prejudice with that of the State and the jury to dispose of the charge in accordance with the truth." *Atkinson*, 186 Ill. 2d at 458. Accordingly, we held that "it is the nature of a past conviction, not merely the fact of it, that aids the jury in assessing a witness' credibility." *Atkinson*, 186 Ill. 2d at 458.

In holding that the trial court had properly conducted this balancing, we noted that the defendant's testimony made up his entire defense, and, therefore, his credibility was "a central issue." *Atkinson*, 186 Ill. 2d at 462. Accordingly, his prior convictions "were crucial in measuring defendant's credibility." *Atkinson*, 186 Ill. 2d at 462. Although "trial courts should be cautious in admitting prior convictions for the same crime as the crime charged," *Atkinson* stressed that "similarity alone does not mandate exclusion of the prior conviction." *Atkinson*, 186 Ill. 2d at 463. This is especially so when the jury is instructed to consider the evidence of the defendant's prior convictions for the limited purpose of impeachment, which ensures that the jurors understood the narrow reason for which the convictions were admitted. *Atkinson*, 186 Ill. 2d at 463.

*Atkinson* further rejected any notion that the *Montgomery* balancing test is not properly performed unless the trial court explicitly states that it is doing so on the record. Defense counsel in *Atkinson* "specifically referred to the balancing test in his argument against impeaching defendant with his prior convictions." *Atkinson*, 186 Ill. 2d at 462. In addition, in discussing admissibility, the trial court "recognized that [it] had to determine whether the probative value of the evidence outweighed its prejudice," and, therefore, it was "clear from the trial judge's comments that he was aware of the *Montgomery* balancing test." *Atkinson*, 186 Ill. 2d at 462-63; see also *People v. Williams*, 173 Ill. 2d 48, 83 (1996) (trial court did not disregard the *Montgomery* rule simply because it did not explicitly state for the record that it was balancing the opposing interests). We thus concluded that "[i]n light of the trial judge's comments, there is no reason to find that the trial court failed to weigh the probative value of the evidence against its possible prejudicial effect in determining the impeachment evidence to be admissible," and, accordingly, found that "the trial court conducted a proper balancing test and thereby adhered to the *Montgomery* rule." *Atkinson*, 186 Ill. 2d at 463.

Like defendant Atkinson, defendant here argues in his request for

cross-relief that the trial court abused its discretion in failing to perform the *Montgomery* balancing test and by allowing the State to impeach defendant with a prior conviction for the same offense for which he was on trial. Pursuant to *Atkinson*, we similarly reject the arguments advanced by defendant.

The record establishes that the hallmark concepts of the third prong of the *Montgomery* balancing test[2] were argued and applied throughout these proceedings. In response to defendant's filing of his motion *in limine*, the State asked the court to defer ruling on whether the convictions were "more prejudicial than probative" until after defendant's testimony. When the issue was later revisited during a sidebar conference after defendant testified, defense counsel argued that the probative value of the introduction of defendant's three prior narcotics convictions was outweighed by their prejudicial effect. The State countered by citing to *People v. Tribett*, 98 Ill. App. 3d 663 (1981), in which the defendant argued that the trial court erred in introducing for purposes of impeachment his prior conviction for possession of a controlled substance–the identical charge for which he was on trial. *Tribett*, 98 Ill. App. 3d at 675. *Tribett* set forth and applied *Montgomery*'s balancing test in rejecting the defendant's argument that the probative value of his prior conviction was outweighed by its prejudicial effect. *Tribett*, 98 Ill. App. 3d at 675. The appellate panel noted that Illinois courts had repeatedly held that a conviction for the unlawful possession or delivery of controlled substances is the type of conviction which is probative of credibility and affords a basis for impeachment. *Tribett*, 98 Ill. App. 3d at 675-76. In addition, *Tribett* held that a prior conviction which is similar to a crime for which the defendant is on trial is not automatically barred (*Tribett*, 98 Ill. App. 3d at 676), and favorably observed that the trial court gave the jury an instruction limiting the use of the defendant's prior conviction (*Tribett*, 98 Ill. App. 3d at 676).

During the sidebar, the trial court inquired of defense counsel whether he had any authority to counter *Tribett* in support of his assertion that admission of defendant's conviction would be more

---

[2]There is no dispute that the first two prongs of the *Montgomery* test were satisfied, and, therefore, they are not at issue in this appeal.

prejudicial than probative, to which defense counsel answered in the negative. The trial court then ruled that only defendant's most recent conviction would be admitted. Although defendant notes that the trial court never specifically stated that it was balancing the factors pursuant to *Montgomery*, we have declined to find error under similar circumstances when the transcript makes it clear that the court was applying the *Montgomery* standard, even though it was not expressly articulated. See *People v. Williams*, 173 Ill. 2d 48, 83 (1996) (although trial court did not explicitly state it was balancing interests pursuant to *Montgomery*, the trial transcript established the court was aware of *Montgomery* and the analysis it requires); *People v. Redd*, 135 Ill. 2d 252, 325-26 (1990) (although trial court did not specifically articulate the *Montgomery* test, the record indicated that it understood and properly exercised its discretion under *Montgomery*). Contrary to defendant's argument, the record does not demonstrate that the trial court failed to weigh the probative value of the impeachment against its possible prejudicial effect. Rather, the record reflects that the trial court was aware of the *Montgomery* standard and gave proper consideration to the relevant factors as part of its balancing process. Indeed, the fact that the trial court barred introduction of defendant's two earlier convictions clearly shows that it was exercising its discretion and attempted to minimize the potential prejudice to defendant by allowing admission of only the most recent conviction and by also providing the jury with limiting instructions regarding the narrow use of that evidence.

In sum, the record establishes that the trial court understood the *Montgomery* balancing test and properly applied that analysis in admitting defendant's conviction. Thus, the trial court's decision to admit defendant's conviction was not error.


## B. *Averett/Patrick*

Having determined that the trial court did not err by admitting defendant's prior conviction for impeachment, we now turn to the issue of the trial court's delay in ruling on defendant's motion *in limine* to exclude his prior convictions. Our most recent pronouncement regarding the proper analysis for determining whether reversal is required after a trial court delays in ruling on a motion *in limine* to exclude a defendant's prior convictions from use as

impeachment is *People v. Averett*, 237 Ill. 2d 1 (2010).[3] In *Averett*, we engaged in a detailed discussion of our decision in *Patrick*,[4] clarifying certain aspects of that ruling.

Defendant Patrick was on trial for first degree murder. *Averett* noted that the trial court had refused to rule on Patrick's motion *in limine* seeking to exclude evidence of his past convictions for use as impeachment prior to his testimony, adhering to a "blanket policy" of deferring decisions on such motions until after a defendant testified. After Patrick testified, the trial court allowed the State to impeach him with his three prior convictions for possession of a controlled substance. Patrick was thereafter convicted by the jury of second degree murder, and the appellate court affirmed. *Averett*, 237 Ill. 2d at 9 (citing *Patrick*, 233 Ill. 2d at 66-67).

On appeal to this court, Patrick argued that the trial court erred in deferring ruling on his motion *in limine* until after he testified. We noted that a trial court's ruling on a motion *in limine* will not be disturbed on review absent an abuse of discretion. Thus, our inquiry in *Patrick* focused on whether the trial court abused its discretion by delaying ruling until after hearing the defendant's testimony. *Averett*, 237 Ill. 2d at 9 (citing *Patrick*, 233 Ill. 2d at 68-69).

In analyzing whether the actions of the trial court amounted to an abuse of discretion, we noted in *Averett* that *Patrick* "discussed the defendant's constitutional right to testify and the importance of the [trial court's] decision [on the motion *in limine*] on whether to testify." *Averett*, 237 Ill. 2d at 9-10 (citing *Patrick*, 233 Ill. 2d at 69-70). The court explained:

---

[3]*Averett* was filed subsequent to the appellate court's decision in this case. Accordingly, the appellate panel did not have the benefit of *Averett* at the time of its ruling.

[4]In *Patrick,* we consolidated Patrick's appeal with that of another defendant, Ezekiel Phillips. Phillips' case, however, was factually distinguishable: unlike Patrick, Phillips did not testify at trial. In *Averett*, we discussed both cases consolidated in *Patrick,* as well as their different factual scenarios. Because the instant cause concerns only the situation in which a defendant has testified at trial, we strictly limit our review of *Patrick* and *Averett* to that specific factual situation.

"Defendants clearly benefit if a ruling on the admissibility of prior convictions is made before deciding whether to testify. An early ruling provides a defendant with information necessary to make the critical decision on testifying and to ascertain the strength of their testimony. An early ruling also allows a defendant to make reasoned tactical decisions in planning the defense." *Averett*, 237 Ill. 2d at 10 (citing *Patrick*, 233 Ill. 2d at 69-70).

Based upon these concerns, this court in *Patrick* recognized a "defendant's need for an early ruling on a motion to exclude prior convictions for impeachment purposes." Accordingly, absent "rare cases," a "trial court will have the information necessary to make a decision before trial." *Averett*, 237 Ill. 2d at 10 (citing *Patrick*, 233 Ill. 2d at 70-73). *Averett* thus reaffirmed the holding in *Patrick* that "a trial court abuses its discretion if it fails to rule on a motion *in limine* to bar evidence of prior convictions for impeachment purposes when it has sufficient information to make the ruling." *Averett*, 237 Ill. 2d at 10 (citing *Patrick*, 233 Ill. 2d at 70-73).

Having recognized that an abuse of discretion occurs when the court deferred ruling on the defendant's motion *in limine* seeking to exclude prior convictions for impeachment until after the defendant testified, the court turned to the question of whether this error could be considered harmless. *Averett*, 237 Ill. 2d at 10 (citing *Patrick*, 233 Ill. 2d at 74-75). *Averett* cited *Patrick*'s application of the harmless-error standard for constitutional errors, meaning that the harmlessness of the error must be established beyond a reasonable doubt. *Averett,* 237 Ill. 2d at 10-11 (citing *Patrick*, 237 Ill. 2d at 75-76, citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). Indeed, *Patrick*'s analysis was described in *Averett* in terms of harmlessness: "[a]fter reviewing the impact of the error in light of the facts of the case, we determined [in *Patrick*] that the error was not harmless." *Averett*, 237 Ill. 2d at 14 (citing *Patrick*, 233 Ill. 2d at 75-76).[5]

---

[5]Even the dissenting justices in *Patrick* agreed that the harmless beyond a reasonable doubt standard is appropriate for review of a trial court's error in delaying ruling on a defendant's motion *in limine* where that defendant testifies at trial. *Patrick*, 233 Ill. 2d at 83 (Burke, J., concurring in part and dissenting in part, joined by Freeman, J.).

*Averett* observed that as part of the harmless-error review in *Patrick*, it was noted that Patrick relied upon a theory of self-defense. Although Patrick's testimony was not absolutely necessary to establish his claim, it was nevertheless important that he know before testifying whether his prior convictions could be used for impeachment. Depending upon the ruling, Patrick could have decided not to testify or could have informed the jury himself of the prior convictions to lessen their impact. *Averett*, 237 Ill. 2d at 10-11 (citing *Patrick*, 233 Ill. 2d at 75-76). Indeed, the impact of the impeachment of defendant with his prior convictions was evinced by the State's repeated argument that the jury should not believe a "three-time convicted felon." *Averett*, 237 Ill. 2d at 11 (citing *Patrick*, 233 Ill. 2d at 75-76). In addition, by returning a guilty verdict of second degree murder, rather than first degree murder, the jury indicated it believed that Patrick was justified to some degree in the use of force. *Averett*, 233 Ill. 2d at 11 (citing *Patrick*, 233 Ill. 2d at 75-76). It is clear, then, that the court's decision in *Patrick*, *i.e.*, to award Patrick a new trial, was predicated on the conclusion that the error was not harmless beyond a reasonable doubt in light of the specific facts in the record. *Averett*, 237 Ill. 2d at 11 (citing *Patrick*, 233 Ill. 2d at 75-76).

*Averett* clarified that the "application of harmless-error review in *Patrick* demonstrates that we did not treat the error as structural. Structural errors are not subject to harmless-error review." *Averett*, 237 Ill. 2d at 14 (citing *Patrick*, 233 Ill. 2d at 75-76). *Averett* reaffirmed that while the reserved-ruling error in *Patrick* is "serious," it is "not comparable to the errors recognized by the Supreme Court as structural," such as a complete denial of counsel or trial by a biased adjudicator. *Averett*, 237 Ill. 2d at 13. Therefore, because this type of error is not structural, such error does not require an automatic reversal of a defendant's conviction. *Averett*, 237 Ill. 2d at 14.

Thus, *Averett* teaches that when a trial court errs by delaying a ruling on a defendant's motion *in limine* to exclude prior convictions for impeachment until after the defendant testifies, and that the defendant does in fact testify, that error does not automatically warrant reversal. Rather, courts of review must determine whether the trial court's error was harmless beyond a reasonable doubt. Harmless-error analysis is "based on the notion that a defendant's interest in an error-free trial must be balanced against societal interests in finality

-16-

and judicial economy." *People v. Simms*, 121 Ill. 2d 259, 275-76 (1988). Because a "defendant's interests are heightened where constitutional error is at issue" (*Simms*, 121 Ill. 2d at 276), the "burden of proof is on the State to show beyond a reasonable doubt that the constitutional error did not affect the outcome of the proceeding" (*People v. McClanahan*, 191 Ill. 2d 127, 139 (2000)). In other words, the inquiry is "whether the defendant would have been convicted regardless of the error." *People v. Dean*, 175 Ill. 2d 244, 259 (1997). In determining whether, in the absence of the error, the outcome of the trial would have been different, review is made of the proceedings as a whole, based upon examination of the entire record. *People v. Howard*, 147 Ill. 2d 103, 148 (1991). Accordingly, we review the record of the proceedings below, just as in *Patrick*, to determine whether defendant would have been convicted in the absence of the error committed by the trial court.

## C. Harmless-Error Analysis

In reviewing whether the trial court's error in reserving ruling on defendant's motion *in limine* was harmless beyond a reasonable doubt, we consider defendant's need to testify in order to present a defense as part of that inquiry. *Averett*, 237 Ill. 2d at 10-11 (citing *Patrick*, 233 Ill. 2d at 75-76). Our careful review of the facts in this case–as set forth in detail at the outset of this opinion–reveals that there existed significant gaps in defendant's theory of the case which required that he testify. In addition, we reject defendant's contention that he did not need to testify because Grayer provided him with an "alibi"[6] defense. To the contrary, Grayer placed defendant at the scene of the offense during the relevant time period, and only defendant could provide information regarding his actions after he was dropped off by Grayer and Chambers. Moreover, Grayer's testimony that Chambers gave defendant one $10 bill and two $1 bills was in conflict with the officers' testimony regarding the denomination of the

---

[6]An alibi is "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Black's Law Dictionary 84 (9th ed. 2009).

currency found in defendant's possession at the time of his arrest. Only defendant could explain why he was in possession of bills in denominations different from those testified to by his own witness. As defendant had no other occurrence witnesses to testify on his behalf as to these points, his testimony denying any wrongdoing at that time and at that location was his only means to present a defense.

Defendant's need to testify, however, is only one factor in determining whether harmless error exists. We also examine whether the parties mentioned defendant's prior conviction in argument. *Averett*, 237 Ill. 2d at 11 (citing *Patrick*, 233 Ill. 2d at 75-76). We reject defendant's assertion that *any* argument made by the State regarding a defendant's credibility renders the error reversible, and hold that this case is factually distinguishable from *Patrick*. There, we held "[t]he impact of the convictions on Patrick's credibility is clear from the State's focused and repeated argument urging the jury *not to believe a three-time convicted felon*." (Emphasis added.) *Patrick*, 233 Ill. 2d at 75-76. In contrast, here the State at no time pointed to defendant's prior conviction to argue that *because* of that conviction he had a propensity to commit the crime charged or that he was unbelievable simply *because* he had been convicted on a prior occasion.

We also consider the strength of the evidence against defendant. See, *e.g.*, *People v. Rivera*, 227 Ill. 2d 1, 26-27 (2007) (determination of whether the improper denial of defendant's peremptory challenge and violation of *Apprendi* were harmless beyond a reasonable doubt premised on analysis of whether the defendant's guilt was overwhelming); *People v. Hart*, 214 Ill. 2d 490, 520 (2005) (determined that a *Doyle* violation was harmless beyond a reasonable doubt when, among other things, there was strong evidence of defendant's guilt); *People v. Cortes*, 181 Ill. 2d 249, 285-86 (1998) (whether improper admission of defendant's prior conviction to explain his relationship to a rebuttal witness was harmless beyond a reasonable doubt depended upon whether other evidence clearly established defendant's guilt). After carefully reviewing the record, we agree with the State that its case was strong, especially when viewed against the inconsistent theory of the defense.

As previously noted, the State presented the unimpeached testimony of three officers that defendant was standing in front of

-18-

4506 West Washington Boulevard between 11 and 11:30 p.m., making three separate sales of prepackaged heroin packets, after which he placed cash in his pants pockets. Defendant was found with $18 crumpled in his pants pockets, consisting of three $5 bills and three $1 bills. These denominations are consistent with the State's theory that during the period of surveillance, defendant had made three sales of small-sized heroin packets, which usually sold for around $5 each.

Although defendant admitted that during part of this surveillance period he was present in front of 4506 West Washington Boulevard, he attempted to explain his presence at that location by linking together a long series of improbable coincidences and contradictory statements, while also leaving substantial gaps in his theory of the case. Defendant testified that he had just arrived in Chicago from Detroit, but no evidence of luggage was found. Defendant's testimony that he Chambers and Grayer drove around visiting defendant's friends conflicted with that of Grayer, who stated that the trio drove aimlessly without making any stops. Defendant stated that he wanted to rent a hotel room for only four hours, but admitted that he would have had to vacate the hotel in the early hours of a winter morning, with no money and no place to go. Defendant then claimed that a friend, known only to him as "West," just happened to live across the street from the hotel, just happened to be outside his home at precisely the same time defendant exited the hotel, just happened to beckon defendant to that location, and just happened to take defendant's luggage inside the house immediately before the police arrived on the scene. Yet, defendant presented no evidence to support this purported chain of events.

Defendant's theory of the case was further undermined by Grayer's testimony that he saw Chambers give defendant one $10 bill and two $1 bills. At the time of defendant's arrest, however, the officers recovered three $5 bills and three $1 bills from defendant's pockets. Defendant provided no explanation for the difference in currency. Moreover, although Grayer stated that he and Chambers returned to the hotel where they dropped defendant off and saw neither defendant nor any police officers, if events had occurred as he testified, Grayer would have likely seen at least police cars at the scene, if not defendant. Moreover, even though Grayer stated he was

a good friend to defendant, when he and Chambers returned to the hotel and did not see defendant, they did not go look for him or try to call him–they simply left.

Taking all of the above factors into consideration, we hold that any error in delaying the ruling was harmless beyond a reasonable doubt. If the court's error were removed, we are convinced that a retrial would end with the same result.

As a final point, defendant contends that the trial court's error was harmful because the record shows that "the jurors considered [defendant's] prior [conviction] during their deliberations" when they asked for a copy of the stipulation regarding his prior conviction. We disagree.

In *People v. Patterson*, 217 Ill. 2d 407 (2005), a jury found the defendant guilty of first degree murder, arson, and concealment of a homicidal death. During deliberations, the jury sent a note to the judge asking for a copy of the grand jury testimony of defendant's girlfriend, who declined to testify at trial. After conferring with the parties, the trial court sent a response to the jury denying this request. On appeal, the defendant argued, *inter alia,* that the trial court erred in admitting this grand jury testimony, as his confrontation rights under *Crawford v. Washington*, 541 U.S. 36 (2004), were violated. Defendant pointed to the jury's note during deliberations asking for a copy of Rivera's grand jury testimony, and argued that the fact that the jury requested this testimony created more than a reasonable probability that it contributed to the guilty verdict. *Patterson*, 217 Ill. 2d at 435. We disagreed. Although we found a *Crawford* violation, we concluded that it was harmless beyond a reasonable doubt. We acknowledged that the jury's request for the contested evidence could suggest that it was curious about the testimony or that it had questions about it. "However, the mere fact that the jury asked for a copy of the testimony does not create a reasonable probability, or even a reasonable possibility, that the jury relied on this testimony in reaching its verdict. To contend that it does is, in our view, speculative." *Patterson*, 217 Ill. 2d at 435.

Likewise, in the instant appeal, the mere fact that the jury requested that the stipulation regarding defendant's prior testimony be read back to it is not dispositive of whether the trial court's error in delaying its ruling on defendant's motion to bar that evidence is

harmless, because any conclusion based on the jury's question is necessarily speculative. Although the State acknowledges that an argument may be raised that the jury's question could show that the stipulated testimony may have played "some role" in defendant's conviction, we decline to speculate concerning the extent of that role or about why the jury requested this information.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed.


Appellate court judgment reversed.


CHIEF JUSTICE KILBRIDE, specially concurring:

I agree with the opinion's analysis in this appeal. As the author of *People v. Patrick*, 233 Ill. 2d 62 (2009), I write separately to voice my disagreement with Justice Garman's special concurrence. Respectfully, the special concurrence has, regrettably, misconstrued *Patrick*'s harmless-error analysis.

In conducting the harmless-error analysis in *Patrick*, we pointed out that the State has the burden of proving that the error was harmless beyond a reasonable doubt. *Patrick*, 233 Ill. 2d at 75 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). *Chapman* focused on whether there is a reasonable possibility that the evidence might have contributed to the conviction or affected a party's substantial rights.

This court's focus in *Patrick* was on how a delay in the trial court's ruling on a defendant's motion *in limine* would affect the defendant's decision whether to testify and the impact of the trial court's delayed ruling. We determined that, as a result of the trial court's unjustified delay in ruling on Patrick's motion *in limine*, Patrick was required to make a tactical decision without the ability to evaluate the impact it would have on his defense and was, therefore, "substantially prejudiced." *Patrick*, 233 Ill. 2d at 75. We then examined the impact of the use of the convictions on Patrick's

testimony and, applying the *Chapman* standard, held that the trial court's error was not harmless beyond a reasonable doubt. *Patrick*, 233 Ill. 2d at 76.

The special concurrence presents two problems. First, the special concurrence turns the harmless-error analysis into a balancing test of harmless versus not harmless error when it criticizes the opinion for not stating "whether [defendant's need to testify] weighs for or against a finding of harmless error." Slip op. at 23 (Garman, J., specially concurring, joined by Thomas, Karmeier and Theis, JJ.). This is not the proper test. Rather, the State bears the burden of proving that the error was "not harmless beyond a reasonable doubt" under *Chapman*.

Second, the special concurrence concludes that under *Patrick*, the more important it is to the defense theory of the case to have the defendant testify, the more harm is done by improperly deferring the ruling. Slip op. at 22 (Garman, J., specially concurring, joined by Thomas, Karmeier and Theis, JJ.). This is exactly the opposite of *Patrick*'s analysis. In *Patrick*, the defendant's need to know whether the convictions would be used was a vital factor in his decision whether to testify. Patrick's testimony was not "absolutely necessary" to his defense. Nevertheless, his decision whether to testify was still "critical." *Patrick*, 233 Ill. 2d at 75. Patrick "was unjustifiably required to make a tactical decision [whether to testify] without the ability to evaluate the impact it would have on his defense." *Patrick*, 233 Ill. 2d at 75. The focus was on Patrick's need to know whether the prior convictions would be used to impeach his testimony because his ability to make an informed decision whether to testify was especially important when his defense did not *require* his testimony. It is the right to make an informed decision whether to testify that is vital in this analysis.

The importance of the defendant's testimony affects how critical it is for the defendant to know whether his prior convictions can be used to impeach him. When the defendant's testimony is absolutely necessary, his need to know whether the convictions can be used to impeach him is likely to have little, if any, effect on his decision to testify. When this knowledge would not have affected his decision whether to testify, the defendant would not have been prejudiced by the error and, accordingly, the error would be harmless beyond a

reasonable doubt. In my view, the special concurrence has focused on a narrow aspect of the *Patrick* analysis and has unfortunately misapplied it in this case.

Moreover, any analysis on the actual impact of the trial court's delayed ruling in this case is unnecessary. The State proved the error was harmless beyond a reasonable doubt since defendant's need to know if the prior convictions were going to be admissible was not a vital factor in his decision to testify.

In sum, the focus of our harmless-error inquiry under *Patrick* is not on the defendant's need to testify but, rather, on the defendant's ability to make an informed decision about whether to testify. Accordingly, I specially concur.


JUSTICE GARMAN, specially concurring:

I have no reservations about the result reached by the court. I write separately only to identify and clarify a point that may lead to misunderstanding of this court's precedents, specifically, *People v. Patrick*, 233 Ill. 2d 62 (2009), and *People v. Averett*, 237 Ill. 2d 1 (2010).

In *Patrick*, after concluding that it was error for the trial court to defer ruling on the defendant's motion *in limine*, we considered whether the error was harmless. The first factor we discussed was whether it had been necessary for Patrick to take the stand in his own defense. Our discussion of this factor was brief:

> "We cannot say that the trial court's error in Patrick's case was harmless beyond a reasonable doubt. Here, Patrick was unjustifiably required to make a tactical decision without the ability to evaluate the impact it would have on his defense. Patrick's counsel was unable to inform the jury whether Patrick would testify and was anticipatorily unable to disclose Patrick's prior convictions to lessen the prejudicial effect the convictions would have on his credibility. As a result, Patrick was substantially prejudiced.
>
> Patrick's decision whether to testify was critical because he relied on a theory of self-defense. While his testimony was not absolutely necessary because other testimony corroborated

-23-

his theory of self-defense, knowing whether his prior convictions were going to be used for impeachment was a vital factor that needed to be weighed. If Patrick had known before testifying that his prior convictions were going to be admitted, he may have decided not to testify, or at least he could have informed the jury earlier of the prior convictions to lessen the negative impact.

The impact of the convictions on Patrick's credibility is clear from the State's focused and repeated argument urging the jury not to believe a three-time convicted felon. The jury's verdict of guilty of second degree murder indicates that, to some degree, the jury believed Patrick was justified in his use of force. Applying the *Chapman* standard, we have no doubt that the error in this case was not harmless to Patrick. Accordingly, we believe a new trial is warranted, and we reverse the judgments of the appellate and circuit courts and remand the cause to the trial court." *People v. Patrick*, 233 Ill. 2d at 75-76.

The clear import of these few paragraphs is that the more important it is to the defense theory of the case to have the defendant testify, the more harm is done by improperly deferring the ruling. A defendant who has the urge to tell his story to the jury, but whose testimony is not essential, could choose not to testify. However, a defendant, like Patrick, who must testify if he is to have any chance of having the jury accept his version of events, is placed in a lose-lose-lose situation. First, he may well be convicted if he sits silent. Second, if he testifies and tells the jury about his prior conviction, he may undermine his own testimony and he will never know how the trial court would have ruled, because he will have mooted the question. Third, if he testifies but does not tell the jury about his prior conviction when he has the opportunity, he runs the risk that the court will deny his motion after he has testified and the State will impeach him with his prior conviction. This was our concern in *Patrick*.

We reiterated this concern in *Averett*, 237 Ill. 2d at 10-11, saying:

"[W]e noted that Patrick relied on a theory of self-defense. Although his testimony was not absolutely necessary to establish his claim, it was still important for Patrick to know before testifying whether his prior convictions could be used

-24-

for impeachment. Patrick may have decided not to testify if he had known he would be impeached with his prior convictions. Alternatively, he could have informed the jury of the prior convictions to lessen their impact. We noted that the impact of the impeachment with Patrick's prior convictions was established by the State's repeated argument that the jury should not believe a three-time convicted felon. Further, the guilty verdict of second degree murder, rather than first degree murder, indicated that the jury believed Patrick was justified to some degree in his use of force. Accordingly, we concluded that Patrick was entitled to a new trial because the error was not harmless beyond a reasonable doubt."

The defendant in the present case misread *Patrick* and *Averett* and, thus, argued in his brief to this court that his testimony was not essential to his defense, thinking that this would work in his favor.

The opinion correctly notes that his testimony was essential because "there existed significant gaps in defendant's theory of the case which required that he testify." Further, the testimony of his so-called "alibi" witness did not eliminate the need for defendant to "provide information regarding his actions" after the alibi witness left the scene. The opinion concludes that "[a]s defendant had no other occurrence witnesses to testify on his behalf as to these points, his testimony denying any wrongdoing at that time and at that location was his only means to present a defense." Slip op. at 18. We then note that his need to testify is "only one factor in determining whether harmless error exists." *Id.*

The opinion, however, does not state whether this factor weighs for or against a finding of harmless error. Indeed, one could reasonably glean from our opinion that when a defendant's testimony is essential to his defense, this factor weighs in favor of our finding a *Patrick* error to have been harmless. This is in direct conflict with *Patrick* and *Averett*, which established that the more crucial the defendant's testimony is to presenting his theory of the case, the more harm results from an improperly delayed ruling on his motion *in limine*.

In the present case, defendant's argument that his testimony was not absolutely necessary is not only mistaken, it misses the point of *Patrick* and *Averett*. To remain consistent with what we have said in

-25-

these cases, we should acknowledge that despite defendant's inartful argument, the fact that his testimony was vitally important to his defense, weighs slightly in favor of finding that the error was not harmless. In *Patrick*, we found reversible error where the defendant's testimony, while not absolutely necessary, would have been quite important in establishing his theory of self-defense. In the present case, however, given the police testimony and the weakness in defendant's own explanation of the events, it is clear that even if the jury had never been informed of his criminal record, he would have been convicted. Thus, the error was harmless.

JUSTICES THOMAS, KARMEIER, and THEIS join in this special concurrence.