2020 IL App (1st) 181188-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
September 1, 2020

No. 1-18-1188

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14-CR-20874 |
| | ) | |
| CHRISTIAN WILLIAMS, | ) | The Honorable |
| | ) | Michael B. McHale, |
| Defendants-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial court did not abuse its discretion in allowing State to elicit a prior consistent statement by a witness; trial court did not abuse its discretion in allowing State to use defendant's prior convictions for murder and attempted murder as impeachment evidence; prosecutor's comments in opening statements and closing arguments did not amount to plain error.

¶ 2    Defendant Christian Williams was convicted in a jury trial of the first degree murder of Thomas Sanchez and sentenced to a mandatory term of natural life imprisonment. Defendant appeals his conviction, arguing that: (1) the trial court erred in allowing the State to improperly introduce a prior consistent statement by a witness; (2) the trial court erred in allowing the State to

impeach defendant with evidence of his previous convictions for first degree murder and attempted murder; and (3) he was denied a fair trial based on comments by the prosecutor in opening statements and closing arguments. For the following reasons, we affirm defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4        Prior to trial, the State filed a motion to allow evidence of other crimes against defendant. The motion described that in the present case, the evidence would show defendant was living in a house with Lauritz Thompsen. On the evening of October 28, 2014, when Thompsen was away, defendant was in the house with Sanchez. They engaged in sexual acts, and defendant stabbed Sanchez in the neck and hands with a butcher knife. Sanchez's body was found naked from the waist down, and a bloody knife was recovered from the floor near it. The next day, defendant told Thompsen that he had killed someone. The police came to the house, where they found defendant covered in the victim's blood.

¶ 5        The other-crimes evidence that the State sought to introduce was that in 1994, defendant had been found guilty of the murder of Steven Sucher and the attempted murder of Kevin Rasmussen. The State's motion described that on April 30, 1993, defendant and Sucher were alone at Rasmussen's apartment. After they engaged in oral sex, defendant stabbed Sucher with a butcher knife and another knife. When Rasmussen returned to his apartment, he found Sucher's body. Defendant attempted to stab Rasmussen also, but he fled and called the police. When the police arrived, they observed Sucher's body with his pants unzipped and pulled down and knives on the ground next to his body. They also found defendant there, covered in the victim's blood.

¶ 6        The trial court granted the State's motion to allow the evidence of the murder of Sucher for the purposes of showing defendant's *modus operandi*, intent, motive, and the absence of mistake

or accident. It denied the State's motion to use the evidence of defendant's attempt to stab Rasmussen on the grounds that it was more prejudicial than probative.

¶ 7    Both parties also filed motions *in limine* concerning the State's ability to use defendant's two felony convictions as impeachment evidence if he testified at trial. Defendant argued that, given that the jury would already be hearing the other-crimes evidence, use of the convictions for impeachment purposes also would be more prejudicial than probative. The State argued that defendant's credibility was likely to be a significant issue if he testified because he was the only eyewitness to the event, and his prior convictions were relevant to his credibility.

¶ 8    The trial court ruled that the State could use both convictions as impeachment evidence. It cited case law affirming the use of prior convictions for offenses of violence that were similar to the offenses for which defendant was on trial. It also reasoned that defendant's credibility would be "a major, major factor in this case" and found that the probative value of the evidence outweighed its possible prejudicial effect.

¶ 9    The case proceeded to trial. In opening statements, the prosecutor made the following statement: "The defendant hates the person he is. The defendant despises his sexuality, and it is upstairs, in that room, when he came face-to-face with it, that he killed. He stabbed and killed [Sanchez] in the neck, while they were engaged in oral sex." Defendant's attorney told the jury that the evidence would show that defendant and Sanchez were in a relationship. They had an argument that resulted in a struggle over a knife, and Sanchez was stabbed during that struggle.

¶ 10    Richard Roberts testified that that on the afternoon of October 28, 2014, defendant and Sanchez came to his home. The three of them sat on his front porch drinking and listening to music. Later that afternoon, defendant and Sanchez left together. They walked north in the direction of the house where defendant was staying, which was about two and a half blocks away. Roberts

testified that they were not arguing or fighting, and he did not see any animosity between them before they left.

¶ 11 Thompsen testified that he had first known defendant about 35 years earlier when Thompsen had taught defendant in high school. They eventually became reacquainted in about 2013 or 2014, when defendant started doing yard work and odd jobs around Thompsen's home, which was a large old house in the Pullman Historic District in Chicago. Several months later, Thompsen allowed defendant to move into the house, and defendant lived in two rooms on the third floor. Thompsen requested that defendant not use the other rooms of the house, except the kitchen and solarium, and that he not bring guests inside the house unless Thompsen knew them.

¶ 12 On the day at issue, Thompsen testified that he told defendant he was going to eat dinner early because he was going to the opera, but he would put the leftovers in the refrigerator that defendant could eat later. He left at about 6:00 p.m. and returned at about 11:00 p.m. He noticed the leftovers had not been eaten and the alarm had not been turned on. The next morning, he noticed that one of his knives was missing from the knife block. Thompsen did not see defendant until late that next morning, which was unusual because defendant usually came downstairs early. He saw defendant briefly walk to the lavatory and go back to his room without speaking to him. When defendant still had not come out late in the day, Thompsen became concerned and went to check on him. He found defendant in one of the guest rooms on the second floor that he was not supposed to use. He asked defendant what he was doing, and defendant said he was taking a nap. Defendant appeared disheveled and was speaking rather incoherently. Thompsen left defendant and went to a different room. Soon after that, defendant came into the room and said, " 'well, I might as well tell you. I think I killed somebody.' " Thompsen asked him who he had killed, and he thought defendant answered " 'some asshole' or 'some dirt bag' or something like that." The prosecutor

asked if defendant had said " 'some scumbag.' " Defendant's attorney objected, but the objection was overruled. Thompsen answered, "That might be it." Thompsen went up the stairs until he saw that there was indeed a body on the floor. He told defendant he had to call the police. He and defendant went downstairs to wait for the police to arrive, and defendant went to the back yard to smoke a cigarette. The police arrived, and Thompsen directed them to the body and to where defendant was. Thompsen testified he did not know Sanchez.

¶ 13    On cross-examination, defendant's attorney asked Thompsen if he remembered for sure what defendant said to him when he asked defendant who he had killed. Thompsen answered that he could not swear to it, but it was "some deprecatory word." Thompsen said he could not say from memory what word defendant had used, but "when I reviewed the police report, I think I recalled him saying 'scumbag.' " Defendant's attorney confirmed with Thompsen that he had not written a police report, but rather the police report was a document the state had given him before he testified, which he did not author.

¶ 14    On redirect examination, the State sought to elicit the fact that in his testimony before the grand jury, Thompsen had testified that when he asked defendant who he had killed, defendant called the victim a "scumbag." Defendant's attorney objected that the State was improperly seeking to elicit a prior consistent statement. The Assistant State's Attorney argued that it was proper because Thompsen had changed his testimony on cross-examination. The trial court overruled defendant's objection, stating that the implication of defendant's questioning on cross-examination had been that Thompsen had fabricated his testimony. Thompson agreed that he had used the word "scumbag" in his testimony before the grand jury.

¶ 15    Following Thompsen's testimony, defendant moved for a mistrial based on the admission of Thompsen's grand jury testimony. The trial court denied this motion, reiterating that it found

defendant's cross-examination to imply that Thompsen had a motive to lie or fabricate his testimony, so the State's rehabilitation was proper.

¶ 16 Four Chicago Police Department Officers, Brandon Kirby, Michael Dicera, Bradley Scaduto, and Steven Born, responded to the call at Thompsen's home shortly after 5:00 p.m. on October 29, 2014. Officer Kirby testified that the officers were directed to the back yard, where they found defendant standing next to a patio table. Officer Kirby testified that he observed dried blood on defendant's hands. He testified that he asked defendant why his hands were so bloody, and defendant answered, " 'I murdered somebody.' " Defendant stated that he had done this the previous night and that the body was upstairs. Officer Kirby stayed with defendant while other officers went inside the house to confirm whether a body was present.

¶ 17 Officer Scaduto testified also that defendant said to the officers that he had murdered somebody the previous night and that the body was upstairs. Officer Scaduto testified that he asked defendant what he had used to kill the victim, and defendant answered that he had used a knife and that it was upstairs in the bedroom. Officer Scaduto then stayed with Thompsen while Officers Born and Dicera went upstairs.

¶ 18 Officer Born testified that, while the other officers had gone to the back yard, he had stayed in the front yard with Thompsen. After Officers Scaduto and Dicera returned, Officer Born went upstairs to check the house. He testified that at the top of the stairs on the third floor, he saw a body without pants, which had bruising of the legs and signs of rigor mortis. There was blood throughout the room and on the body. The body was by a dresser in the room. He then exited the third floor and secured it until detectives arrived.

¶ 19 Chicago Police Department Detective Abdalla Abuzanat was at that time an evidence technician involved in processing the scene at issue. He testified that the body of a male was found

on the third floor. The victim was lying on his back, naked from the waist down with his underwear around his thighs. There appeared to be dried blood on his face and a pool of blood by his head and neck area. A knife was found near the body at the base of the dresser. A bloody sock and several bloody footprints were found also. There were also some beer cans in the room. The scene was marked, photographed, and video recorded, and the evidence was collected. The knife was recovered and sent for processing.

¶ 20       Chicago Police Department Detective Joseph McGuire testified that he was assigned to photograph and collect defendant's clothes while he was in one of the interview rooms at the police station. Detective McGuire testified that he observed a large amount of what appeared to be blood stains on defendant's shirt. There was also blood on his sandals. He photographed defendant's hands, which appeared to be covered in dried blood. He testified that he observed no discernible injuries on defendant's hands. There was also dried blood on the crown of defendant's head but no scrapes or cuts to which the blood could be attributed.

¶ 21       Dr. Joshua Akers, a fellow in forensic pathology at the Cook County Medical Examiner's Office, testified that he had reviewed the autopsy report written by the forensic pathologist who had originally performed Sanchez's autopsy, along with photographs, the investigate report, and a body diagram. He testified that Sanchez's body was found to have a stab wound on the right side of his neck. The stab wound was two inches deep and caused injury to the jugular vein and carotid artery. There were other superficial wounds to the neck, left forearm, and left hand, as well as multiple blunt force injuries. Dr. Akers testified that the wounds on Sanchez's forearm and hands were consistent with defensive wounds sustained in an attempt to ward off injury to the face and torso. Toxicology showed Sanchez's blood alcohol level of .177. Dr. Akers expressed an opinion that the cause of death was multiple sharp force injuries and the manner of death was homicide.

On cross-examination, Dr. Akers acknowledged that in the original medical examiner's report there was no mention of defensive wounds.

¶ 22    Kevin Rasmussen was called to testify about the events of April 30, 1993. Rasmussen testified that the prior night, he had gone to a coworker's retirement party. When it ended, Rasmussen invited people to his apartment for drinks. Defendant and Steven Sucher, both of whom were Rasmussen's acquaintances from work, were among about ten people who came to the apartment, where Rasmussen lived alone. He eventually went to bed before all the guests had left. The next morning, defendant and Sucher were still at his apartment, sitting at the table and drinking beer. Rasmussen left for work and told them to lock the door behind them when they were ready to leave. When Rasmussen returned home after work, he found defendant still sitting at the table. He noticed that in the apartment, there was a blanket with something underneath it that had not been present when he had left for work. He grabbed the edge of the blanket and realized that Sucher's body was underneath it, covered in blood. He also noticed defendant had a kitchen knife in his hands. Rasmussen exited the apartment and called the police.

¶ 23    Mike Sherwin testified that, on May 1, 1993, he was working as an Assistant State's Attorney for Cook County and took an oral statement from defendant. He testified that defendant had agreed to talk to him and stated that he and Sucher had been alone together at Rasmussen's apartment. They had been drinking. At some point, Sucher began talking about having sex. Sucher put his penis in defendant's mouth, but defendant pulled away. Sucher told defendant he was going to tell the people they worked with what had happened, so defendant went to the kitchen, got a knife, returned, and stabbed Sucher. While defendant was stabbing Sucher, the knife broke. Defendant went back to the kitchen, retrieved a new knife, and continued stabbing him. Sucher fell to the ground and defendant placed a covering over him. Sherwin testified that defendant told them they

had been drinking. On cross-examination, Sherwin acknowledged he did not take any notes during the interview, and the statement was not recorded on video, taken down by a court reporter, or signed by defendant.

¶ 24      The State presented several stipulations. Among these were that the DNA profile from the blood stain on defendant's shirt matched that of Sanchez and not that of defendant. Also, the DNA profile from the blood stain on the knife matched that of Sanchez and not that of defendant. The State then rested. Defendant's motion for directed verdict was denied.

¶ 25      Defendant testified in his defense. He fronted the fact that in 1994, he had pled guilty to first degree murder and attempted first degree murder. He testified that on October 28, 2014, he was living with Thompsen, whom he described as his former lover. He testified that Thompsen had been his teacher in high school, and they became romantically involved for about six months beginning in 2013. He moved into Thompsen's house and continued living there after their relationship ended. Thompsen did not allow him to have guests in the house. He explained he was not gay, but rather he was transgender, and he explained that this meant that he's "a woman trapped in a man's body." He testified that he had known this his whole life, and it was not something he hated about himself.

¶ 26      Defendant testified that for about six months prior to October 28, 2014, he and Sanchez had been dating. Sanchez knew he lived with Thompsen. On the evening at issue, defendant went to his friend's home, where Sanchez was present. Defendant testified they were drinking, and defendant became intoxicated. Defendant and Sanchez eventually left together and went to defendant's house. On the way, Sanchez started an argument about the two of them moving into an apartment together. During the argument, Sanchez said, " 'look you bitch, I'm the man. We're going to do it my way.' " He also began accusing defendant of having sex with Thompsen. This

was the first time Sanchez had made such comments to defendant, and defendant was in shock. When they got to defendant's house, defendant told Sanchez to go home. Defendant then left Sanchez and went to buy more beer to drink alone.

¶ 27    When defendant returned about half an hour later, Sanchez was still in front of his house. They started arguing again about moving in together. Defendant attempted to go inside the house without Sanchez, but Sanchez pushed his way into the house and walked toward the kitchen. Defendant tried to get him to leave, but he stayed in the kitchen and continued arguing with defendant about the move. After about ten minutes of arguing, Sanchez took a knife from the knife rack, pointed it within about five inches of defendant, and said, " 'bitch, you're going to do what I want to do.' " Defendant was scared and pleaded with Sanchez to put the knife down and leave. Sanchez then said, " 'let's go up to your bedroom.' " They went upstairs, with Sanchez following defendant with the knife. Defendant was scared Sanchez was going to trip him and stab him. Sanchez was making vulgar statements indicating that he wanted sex. Defendant asked him again to put the knife down, and Sanchez put it on the dresser. Sanchez then took his pants off and began to take his underwear off, which was not something defendant wanted. As Sanchez did this, he tripped and fell against the dresser, causing the knife to fall. When the knife fell, defendant dove for it. Sanchez dove for it also, and they struggled over it for several minutes. During the struggle, Sanchez almost stabbed defendant in his eye. This terrified defendant, and he stabbed Sanchez in the neck.

¶ 28    Defendant testified that after he stabbed Sanchez, Sanchez gurgled for a couple seconds and then died. Defendant sat Sanchez against a chair to see if he would be all right. Defendant stated that he then went into shock. He was devastated that he had just killed his lover, so he drank the beer that he had just purchased and went to sleep. He did not clean himself up because he was in

shock and could do nothing but lay in bed. He did not call the police because he was afraid. Eventually he woke up, found Thompsen, and told him he had killed somebody. He did not use the word "scumbag" or any other negative term for Sanchez when he told Thompsen what he had done. Thompsen told him to wait in the garden while he called the police. When the police arrived, defendant answered their questions and told them where the knife was. Defendant also reviewed certain photos showing abrasions and contusions that he sustained in the altercation with Sanchez.

¶ 29   On cross-examination, defendant stated that both he and Sanchez were holding onto the knife when he stuck it into Sanchez's neck. He also testified that Sanchez lost control over the knife, and that was when defendant stabbed him. At first, he testified that when he stabbed Sanchez, Sanchez was laying on his back on the floor with defendant on top of him. Later in his testimony, he agreed that the stabbing occurred when Sanchez was on his (defendant's) back, and defendant took the knife and lunged it back at Sanchez. When asked about this discrepancy in his testimony, defendant stated he could not remember whether he was on top of Sanchez or whether Sanchez was on top of him when the stabbing occurred. Defendant agreed that he was struggling to remember what happened that night, and he was confused. He agreed that he did not know how Sanchez was stabbed other than defendant plunging a knife into his neck.

¶ 30   Defendant acknowledged that he had passed a number of doors that he could have entered when he was walking up the stairs at knifepoint, one of which was his bathroom door that had a lock. He also testified that when he and Sanchez got to the bedroom, he took his shoes off and was drinking from one of his cans of beer. He testified that Sanchez did not drink a beer at that point, but he also agreed that one of the photographs in evidence showed a second can of beer. He testified that after he propped Sanchez against the chair, he left him there, took his bag of beers, went

downstairs, and drank approximately five beers. He then went into a guest bedroom and fell asleep, because he could not sleep in the room with Sanchez's body.

¶ 31    After defendant testified, the defense rested. In rebuttal, the State published to the jury a certified copy of defendant's 1994 convictions for murder and attempted murder. The State then rested in rebuttal.

¶ 32    In closing arguments and rebuttal closing, the prosecutor emphasized the fact that defendant referred to Sanchez as a "scumbag" and did nothing to help him after stabbing him. The prosecutor also characterized defendant's claim of self-defense as being ridiculous and a lie, arguing that he could not keep his story straight. Defendant's attorney argued that both defendant and Sanchez were very drunk that night, they got into an argument, and defendant's explanation of what happened was the truth. He argued that defendant was not lying and had not lied about anything of significant importance. He argued that the fact that defendant was drunk and scared explained why he acted the way he did, and he noted that defendant had not tried to run away.

¶ 33    The trial court instructed the jury, including about the fact that it could consider evidence of defendant's prior convictions only as it may affect his believability as a witness and not as evidence of his guilt of the offense for which he was charged. The jury found defendant guilty of first degree murder. He was sentenced to a term of natural life imprisonment. Defendant's amended motion for a new trial was denied, and this direct appeal now follows.

¶ 34                                  II. ANALYSIS

¶ 35                        A. Thompsen's prior consistent statement

¶ 36    Defendant's first argument on appeal is that the trial court erred by allowing the State to rehabilitate Thompsen with his testimony before the grand jury that, when Thompsen asked defendant who he had killed, defendant had referred to the victim as a "scumbag." Defendant

- 12 -

argues that this evidence was inadmissible as a prior consistent statement, because there was no charge that Thompsen had recently fabricated his testimony. He argues that even if there was a suggestion of fabrication, Thompsen's grand jury testimony did not disprove, explain, or qualify the making of an inconsistent statement.

¶ 37   The general rule is that a witness may not be rehabilitated by the admission of a prior statement consistent with his testimony at trial. *People v. Heard*, 187 Ill. 2d 36, 70 (1999). "The reason behind this rule has been explained as follows: 'The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve.' " *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60 (quoting *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985)).

¶ 38   A prior consistent statement is admissible, however, to rebut an express or implied suggestion on cross-examination that the witness is motivated to testify falsely or that his testimony is of recent fabrication. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 15. This exception does not apply merely because the testimony of the witness has been discredited or to rebut a charge of mistake, poor recollection, or inaccuracy. *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010). Also, the prior consistent statement must disprove, explain, or qualify the making of the inconsistent statement to be admissible on redirect examination under this exception. *Id.* at 641-42. A prior consistent statement admitted on this basis may be used solely for rehabilitation and not as substantive evidence. *Randolph*, 2014 IL App (1st) 113624, ¶ 15. This court will not reverse a trial court's evidentiary ruling concerning a prior consistent statement absent an abuse of discretion. *People v. Davis*, 2018 IL App (1st) 152413, ¶ 59.

¶ 39     Here, the trial court allowed the State to introduce Thompsen's grand jury testimony, in which he testified that defendant had referred to the victim as a "scumbag," based on its determination that defendant's questioning on cross-examination had implied that Thompsen had fabricated his testimony. On direct examination, Thompsen testified that when he asked defendant who he had killed, "I think he said 'some asshole' or 'some dirt bag' or something like that." Thompsen was then asked if defendant had said " 'some scumbag,' " and he answered, "That might be it." Then, on cross-examination, defendant's attorney questioned him as follows:

> "Q. And you indicated that he might have said asshole or scumbag. But do you remember for sure what he said to you?
>
> A. At this point, I would—could not swear to it.
>
> Q. Okay. So you—
>
> A. It was some deprecatory word, though.
>
> Q. You can't tell us today what he said?
>
> A. Not from my immediate memory but I think in my—when I reviewed the police report, I think I recalled him saying scumbag.
>
> Q. Okay. *So you read that in a report. Did you write a police report?*
>
> A. No.
>
> Q. Okay. *So it was a document that the State gave you, that you did not author?*
>
> A. That's correct.
>
> Q. *And that was before you testified today?*
>
> A. Yes. That was a long time ago." (Emphases added.)

¶ 40     We find that the trial court did not abuse its discretion in determining that defendant's attorney's questions to Thompsen on cross-examination implied that he had recently fabricated the testimony that defendant had used the word "scumbag" when he told Thompsen who he had killed. In the first few questions above, defendant's attorney successfully discredited Thompsen's testimony or showed he had poor recollection about whether defendant had used the word "scumbag." However, after Thompsen stated that he thought he recalled him using that word after reviewing the police report, defendant's attorney's next three questions went beyond merely discrediting him or showing poor recollection. These questions can be read to imply that Thompsen had used that word only because he had read it in a police report, which he did not write, and which had been given to him by the prosecution before he testified that day. In other words, they could imply that he had recently fabricated his testimony.

¶ 41     Defendant argues that even if there was a suggestion of recent fabrication, the grand jury testimony did not disprove, explain, or qualify any inconsistency. We disagree. The jury in this case was aware from an earlier, unrelated impeachment of Thompsen that he had testified before the grand jury on October 30, 2014. Thus, evidence that Thompsen had testified to defendant's use of the word "scumbag" so soon after defendant had said it serves to disprove the implication that Thompsen had recently fabricated that testimony after reviewing police report before he testified at trial.

¶ 42                    B. Use of prior convictions for impeachment

¶ 43     Defendant's second argument is that the trial court erred in allowing the use of his convictions in 1994 for murder and attempted murder as impeachment evidence. He argues that the probative value of introducing his prior first-degree murder conviction was substantially outweighed by the danger of unfair prejudice to him, because (1) it involved the same offense of first-degree murder

for which he was on trial, thereby increasing the risk that the jury would draw the improper inference that he must be guilty because he had committed the same offense before; and (2) as extensive evidence of the details of Sucher's killing was admitted as other-crimes evidence, the jury could not reasonably have been expected to limit its use of the evidence of his conviction to the evaluation of defendant's credibility as a witness.

¶ 44    In *People v. Montgomery*, 47 Ill. 2d 510 (1971), the supreme court provided trial courts with the discretion to allow impeachment of a witness' testimonial credibility by admitting evidence of a prior conviction. Under the *Montgomery* rule, evidence of the prior conviction of a witness is admissible to attack the credibility of that witness where: (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment; (2) less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011) (citing *Montgomery*, 47 Ill. 2d at 516); see also Ill. R. Evid. 609(a), (b) (eff. Jan 1, 2011).

¶ 45    Only the third *Montgomery* factor is at issue in this appeal. This factor requires a trial court to conduct a balancing test, weighing the conviction's probative value against its potential prejudice. *Mullins*, 242 Ill. 2d at 14. The probative value with which the trial court is concerned is the weight that the evidence of the convictions may have in impairing the credibility of the witness. *People v. McKibbins*, 96 Ill. 2d 176, 188 (1983). The fact that the credibility of the defendant's testimony will be a central issue for the jury to decide increases the probative value of a prior conviction. *Mullins*, 242 Ill. 2d at 16; *People v. Atkinson*, 186 Ill. 2d 450, 462 (1999).

¶ 46       In balancing the probative value of a conviction against the risk of unfair prejudice, the trial court "should consider, *inter alia*, the nature of the prior conviction, the nearness or remoteness of that crime to the present charge, the subsequent career of the person, the length of the witness' criminal record, and whether the crime was similar to the one charged." *Mullins*, 242 Ill. 2d at 14-15 (citing *Montgomery*, 47 Ill. 2d at 518). Also, because the prejudice caused by the disclosure of a prior conviction may cause a defendant to forego testifying, the trial court may consider " 'the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction.' " *Montgomery*, 47 Ill. 2d at 517-18 (quoting *Luck v. United States*, 348 F.2d 763, 768 (D.C. Cir. 1965)). If the trial court determines that the prejudice substantially outweighs the probative value of admitting the evidence, then the evidence of the prior conviction must be excluded. *Mullins*, 242 Ill. 2d at 15 (citing *Montgomery*, 47 Ill. 2d at 518). The determination of whether a prior conviction is admissible for purposes of impeachment is within the sound discretion of the trial court. *Mullins*, 242 Ill. 2d at 15 (citing *Montgomery*, 47 Ill. 2d at 517-18).

¶ 47       In the usual analysis, reviewing courts have looked to whether the record confirms that the trial court, in allowing use of a prior conviction, did so with awareness of the *Montgomery* standard and the balancing test it requires. See, *e.g.*, *Mullins*, 242 Ill. 2d at 18-19; *Atkinson*, 186 Ill. 2d at 462-63; *People v. Williams*, 173 Ill. 2d 48, 83 (1996); *People v. Clay*, 379 Ill. App. 3d 470, 477 (2008). Here, defendant does not contend that the trial court failed to conduct the balancing test required by *Montgomery*. Rather, he argues that the trial court's admission of his prior conviction evidence amounted to an abuse of its discretion.

¶ 48       Defendant's first argument why the trial court's admission of his prior conviction for first degree murder was an abuse of discretion was that it was identical to the offense for which he was

on trial. He contends that allowing the jury to hear evidence that he had previously been convicted of first degree murder significantly prejudiced him by putting "inevitable pressure on the jurors to reject his self-defense testimony and believe that if he had been convicted of a previous murder, he more than likely committed the murder in this case."

¶ 49        As referenced above, one of the factors that trial courts should consider as part of the *Montgomery* balancing test is whether the crime for which the defendant was previously convicted is similar to the one for which he or she is on trial. *Montgomery*, 47 Ill. 2d at 518. The supreme court has emphasized "that trial courts should be cautious in admitting prior convictions for the same crime as the crime charged." *Atkinson*, 186 Ill. 2d at 463; see also *People v. Cox*, 195 Ill. 2d 378, 384 (2001) (such convictions should be admitted "sparingly"). The rationale for excluding such convictions is " 'the inevitable pressure on lay jurors to believe that "if he did it before he probably did so this time." ' " *People v. Williams*, 161 Ill. 2d 1, 38 (1994) (quoting *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967)). "Nonetheless, similarity alone does not mandate exclusion of the prior conviction." *Atkinson*, 186 Ill. 2d at 463; see also *Mullins*, 242 Ill. 2d at 16.

¶ 50        In this case, the trial court's comments demonstrate that it took into account the risk of unfair prejudice associated with admitting evidence of a prior conviction for first-degree murder in a case in which defendant was on trial for that same offense. It determined, though, that because defendant's "[c]redibility will, obviously, be a major, major factor in this case," the probative value of allowing the jury to hear evidence of the prior conviction outweighed the risk of prejudice to him. The trial court specifically cited *People v. Redd*, 135 Ill. 2d 252, 326 (1990), in which the supreme court held that allowing the use of a defendant's prior convictions in a similar context was a proper exercise of discretion by a trial court.

¶ 51    In *Redd*, the defendant was on trial for the rapes and murders of two children. *Id.* at 260-61. He also had prior convictions for rape and attempted murder, which he sought to bar on the basis that they were so similar to the charges he faced that he could not get a fair trial. *Id.* at 326. The State had argued that the defendant's case turned on his credibility and that it was within the trial court's discretion to find that his convictions for similar offenses were also an aid in determining credibility. *Id.* Based on these arguments, the supreme court held that the trial court understood its discretion under *Montgomery* and acted properly in denying the defendant's motion. *Id.*

¶ 52    In addition to citing *Redd*, the trial court in this case also cited *Williams* for the fact that it was a murder case in which use of a prior conviction for a similar violent offense was affirmed. There, the defendant was on trial for first-degree murder, attempted murder, and aggravated battery with a firearm, and the supreme court had affirmed the trial court's discretionary determination that the defendant could be impeached with his prior conviction for aggravated battery. See *Williams*, 173 Ill. 2d at 83. The trial court here stated that while these were not the same offenses, they were "awfully similar."

¶ 53    We hold the trial court did not abuse its discretion by allowing evidence of a prior conviction for the same offense for which defendant was on trial. As the trial court recognized, case law has affirmed the discretion of trial courts to allow the use of prior convictions for murder or attempted murder as impeachment evidence even where the defendant is on trial for murder, where the defendant's credibility is a central issue in the trial. *Redd*, 135 Ill. 2d at 326; *Clay*, 379 Ill. App. 3d at 477. Although defendant contends that his first degree murder conviction had little bearing on his testimonial credibility because it was a crime of violence, it was within the trial court's discretion to conclude otherwise. Defendant states in his brief that first degree murder is "the most severe crime that can be committed in Illinois." It is within the trial court's discretion to find that

evidence that a defendant has previously been convicted of such a severe offense has probative value in impeaching his or her credibility as a witness. The trial court properly recognized that this case essentially turned on whether the jury found defendant credible in his testimony that he killed Sanchez in self-defense. The importance of the jury's evaluation of defendant's credibility thus increased the probative value of the prior conviction. See *Mullins*, 242 Ill. 2d at 16; *Atkinson*, 186 Ill. 2d at 462. As such, there was no abuse of discretion in the trial court's determination that its probative value was not substantially outweighed by the danger of unfair prejudice.

¶ 54      Further, the trial court here instructed the jury that it may consider evidence of defendant's prior conviction only as it may affect his believability as a witness and that it must not consider the prior conviction as evidence of his guilt of the offense with which he was charged. Ill. Pattern Jury Instruction, Criminal, No. 3.13 (approved Oct. 17, 2014). The risk of prejudice in admitting evidence of a prior conviction for a similar offense has been held to be diminished where, as here, the jury is properly instructed on the limited use of this evidence. *People v. Barner*, 374 Ill. App. 3d 963, 972 (2007) (citing *Atkinson*, 186 Ill. 2d at 463).

¶ 55      Defendant also argues that the prejudicial effect of admitting his prior conviction for impeachment was increased because the jury was presented not just with the fact of conviction, but with specific details of the killing that led to that conviction. Evidence of the details of Sucher's killing was admitted substantively during the State's case-in-chief as other-crimes evidence, on the issues of defendant's intent, knowledge, *modus operandi*, and to show the absence of accident or mistake. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Defendant does not contend there was any error in admitting these details as other-crimes evidence. Rather, he contends that he suffered prejudice because, after the jury heard all of the evidence of the details of Sucher's killing, when it was also then told that defendant had been convicted of the murder, it was unreasonable to expect

the jury to limit its consideration of the evidence of that prior conviction only to its effect on his credibility as a witness.

¶ 56       In support of this argument, defendant relies upon cases standing for the proposition that, when a defendant is impeached with a prior conviction, only the fact of conviction is admissible, not the details giving rise to it. In *People v. DeHoyos*, 64 Ill. 2d 128, 132 (1976), the supreme court found reversible error where a trial court had permitted the State to elicit from its own witness not just the fact of his prior conviction but also the length of his sentence and the amount of time he spent imprisoned. In *People v. Dudley*, 217 Ill. App. 3d 230, 232 (1991), the appellate court held that the trial court erred in allowing the State to introduce docket sheets and charging instruments that contained details about the charges giving rise to defendant's prior convictions. In *People v. Pruitt*, 165 Ill. App. 3d 947, 954 (1988), the court stated that it was improper to tell the jury of the sentence received by a defendant for a prior conviction, as it was immaterial to credibility, but the error was harmless. In *People v. Rhodes*, 81 Ill. App. 3d 339, 348 (1980), the court stated that, while it was improper for a prosecutor to have gone into the details giving rise to defendant's guilty plea, the issue had been waived. None of the cases cited by defendant address the precise situation here, in which the details giving rise to a prior conviction were properly and substantively admitted as other-crimes evidence during the State's case-in-chief and the jury later heard impeachment evidence that defendant had been convicted.

¶ 57       Our review of the record indicates that defendant specifically argued to the trial court that, given the details that the jury was hearing as other-crimes evidence, it was too prejudicial for the jury to hear that defendant had been convicted for this conduct also. Although the trial court did not specifically discuss this argument when ruling, it obviously rejected it. We find that it did not abuse its discretion in doing so.

¶ 58        We believe that it would be appropriate for a trial court, when balancing the probative value of a prior conviction against the risk of unfair prejudice under *Montgomery*, to consider the fact that the details of the conduct giving rise to the prior conviction are being substantively admitted as other-crimes evidence in the State's case-in-chief. In doing so, the trial court may well conclude in its discretion that because the jury will already know of the conduct that gave rise to the prior conviction, the defendant will suffer little additional prejudice from admitting the conviction itself as impeachment evidence. Also, it will often be the case that, when the trial court considers the admissibility of underlying conduct as other-crimes evidence, it will engage in a similar evaluation of whether the prejudicial effect of admitting that evidence substantially outweighs its probative value. See *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). The record discloses that the trial court made such an evaluation concerning the other-crimes evidence that was admitted in this case. We see no reason why the trial court would abuse its discretion by drawing the same conclusion about the use of the ultimate fact of conviction as impeachment evidence that it did regarding admission of the underlying conduct as other-crimes evidence.

¶ 59        Ultimately, it is clear that the trial court was aware that the details of Sucher's killing were being admitted as other-crimes evidence, and it also found that the probative value of the prior conviction as impeachment evidence was not outweighed by the risk of unfair prejudice. Defendant has demonstrated no abuse of discretion in this determination.

¶ 60        Finally, defendant argues that the trial court erred in allowing his conviction for the attempted murder of Rasmussen to be used as impeachment evidence. He points out that the trial court had ruled that his conduct in attempting to stab Rasmussen was not admissible as other-crimes evidence, on the grounds that it was more prejudicial than probative, and he argues that for this same reason his conviction was inadmissible as impeachment evidence. We find no merit to

defendant's argument that simply because his conduct in attempting to stab Rasmussen was inadmissible as other-crimes evidence, his prior attempted-murder conviction should not have been usable as impeachment evidence either.

¶ 61    Defendant argues that his prior conviction for attempted murder was not probative for impeachment purposes because it was a crime of violence having no bearing on defendant's honesty or veracity. For this proposition, defendant relies on *People v. Elliot*, 274 Ill. App. 3d 901, 909 (1995). However, this court has recognized that *Elliott* and similar cases indicating that the nature of a prior conviction must bear on a witness' truthfulness before it can be considered for use as impeachment has been "trumped" the later cases of *Williams*, 173 Ill. 2d at 82-83, and *Atkinson*, 186 Ill. 2d at 461. See *Stokes v. City of Chicago*, 333 Ill. App. 3d 272, 278-79 (2002); see also *People v. Garner*, 2017 IL App (2d) 150045, ¶ 25 ("Since *Williams*, our supreme court has made clear that a conviction of a felony that does not directly involve dishonesty *** can still be admissible under *Montgomery*"). Thus, we reject defendant's argument that the trial court abused its discretion in allowing use of his attempted-murder conviction for this reason.

¶ 62    Rather, as discussed in greater detail above, we find the trial court recognized its discretion under *Montgomery* and properly exercised it in allowing defendant's prior attempted-murder conviction to be used as impeachment evidence. Its citations to *Redd* and *Williams* indicate its sensitivity to the concern that defendant's prior convictions were for violent offenses that were similar to the offense for which the defendant was on trial. Nevertheless, the trial court recognized that defendant's credibility would be a major factor for the jury to evaluate in this case. Thus, as with defendant's prior conviction for the murder of Sucher, we find that the trial court properly exercised its discretion in concluding that the probative value of admitting evidence of defendant's

prior conviction for the attempted murder of Rasmussen was not substantially outweighed by the risk of unfair prejudice to defendant.

¶ 63                    C. Comments in opening statement and closing argument

¶ 64        Defendant's final argument is that he was denied a fair trial because the prosecutor made references in opening statements to evidence that the State never attempted to introduce at trial and made comments in closing arguments calling the defendant a liar and disparaging the defense. He argues that the cumulative effect of these multiple incidents of misconduct by the prosecutor denied him a fair trial, and his conviction should be reversed for this reason.

¶ 65        Initially, defendant acknowledges that he forfeited review of this issue by failing to object when these comments were made during the opening statements and closing arguments and by not raising these errors in his posttrial motion. Nevertheless, he argues that these issues should be reviewed under the plain error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). This doctrine serves as a narrow and limited exception to the general rule of procedural default. *People v. Jackson*, 2020 IL 124112, ¶ 81. A reviewing court will consider unpreserved error when a clear or obvious error occurs and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* When a defendant fails to establish plain error, the procedural default will be honored. *Id.* In addressing a claim of plain error, it is appropriate to first determine whether reversible error occurred at all. *Id.*

¶ 66            *1. Opening statement references to evidence the State never sought to introduce*

¶ 67        The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). An opening statement may include

a discussion of the expected evidence and of reasonable inferences from that evidence. *Id.* A prosecutor may not make a statement in opening that the State does not intend to prove or cannot prove. *Id.* As such, it is improper for a prosecutor to comment in opening statements about testimony to be introduced at trial and then fail to produce that evidence. *Id.* However, reversible error occurs only where the prosecutor's comments in opening statement are attributable to deliberate misconduct and result in substantial prejudice to the defendant. *Id.*

¶ 68        During opening statements, the prosecutor stated, "The defendant hates the person he is. The defendant despises his sexuality, and it is upstairs, in that room, when he came face-to-face with it, that he killed. He stabbed and killed [Sanchez] in the neck, while they were engaged on oral sex." Defendant contends that the State never attempted to produce evidence at trial to support this theory that defendant hated himself or despised his sexuality and therefore killed Sanchez when they were engaged in oral sex. Defendant contends these comments created an illusion of a motive for the killing of Sanchez, but that motive was unsupported by the evidence or inferences that could reasonably be drawn from the evidence.

¶ 69        The State contends that the comments were supported by the evidence adduced at trial. Specifically, it points to the other-crimes evidence, which the jury was appropriately allowed to consider in evaluating defendant's motive in the present case. It cites the testimony of former Assistant State's Attorney Sherwin that, in 1993, defendant had told him that the reason he had killed Sucher was because Sucher threatened to tell defendant's co-workers that they had engaged in oral sex. The State contends that this outsized response by defendant at the threat of having his sexuality revealed to his coworkers supports the inference that he despised his sexuality. The State contends that the circumstances of Sanchez's killing were very similar to Sucher's killing, and defendant himself testified that Sanchez's killing occurred after Sanchez wanted to have sex but

defendant did not. Thus, the State argues, the comments at issue were supported by the evidence and by the reasonable inferences to be drawn from the evidence.

¶ 70    We accept the State's argument that this comment was an inference that could fairly and reasonably be drawn from the evidence that was presented at trial. Even if it was not, however, we would not find that this isolated comment in opening statements amounted to deliberate misconduct and resulted in substantial prejudice to defendant so as to result in reversible error. Therefore, defendant has failed to establish plain error.

¶ 71        *2. Closing arguments disparaging defense and telling jury defendant had lied*

¶ 72    Defendant also argues that the prosecutor improperly disparaged the defense in closing arguments and rebuttal arguments, including by repeatedly telling the jury that defendant's testimony and the defense were ridiculous and full of lies.

¶ 73    Prosecutors have wide latitude in the content of their closing arguments. *Jackson*, 2020 IL 124112, ¶ 82. They may comment on the evidence and on any fair and reasonable inference that the evidence may yield, even if the suggested inference reflects negatively on the defendant. *Id.* The prosecutor may challenge a defendant's credibility and the credibility of the theory of defense when there is evidence to support such a challenge. *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000). However, unless based on some evidence, a prosecutor may not make arguments suggesting that the defense counsel fabricated a defense theory, attempted to free his or her client through trickery or deception, or suborned perjury. *People v. Emerson*, 97 Ill. 2d 487, 497 (1983). Also, a prosecutor's statements will not be held improper if they were provoked or invited by the argument of defense counsel. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009).

¶ 74    Challenged remarks must be viewed in the context of closing arguments as a whole. *Kirchner*, 194 Ill. 2d at 549. "A reviewing court will find reversible error only if the defendant demonstrates

that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83.

¶ 75    Defendant argues that the prosecutor made repeated comments in closing arguments and rebuttal arguments implying that defendant and his attorney were lying, making up testimony, and hiding the truth. He argues that in their totality, these comments denied him a fair trial.

¶ 76    He first takes issue with the prosecutor's statement in closing argument that, when defendant took the stand, he had spun "a very incredible tall tale. One that is so ridiculous that it defies belief. Each part of this defendant's testimony on that stand yesterday was more ridiculous than the part before it. Each part." To consider this comment in context, we observe that after making it, the prosecutor then proceeded to cite various aspects of defendant's testimony that, he argued, were inconsistent or not believable. This included defendant's testimony that Sanchez grabbed a knife from the kitchen and led defendant at knifepoint to his third-floor bedroom, despite his having never been in defendant's house before; that defendant never attempted to escape on the way upstairs despite passing multiple doors through which he could have done so; that defendant opened and drank a beer and took off his shoes while allegedly being threatened with a knife; that defendant would attempt to grab the knife when Sanchez fell and knocked it off the dresser instead of simply fleeing the room; and that defendant would not give any aid to Sanchez if he stabbed him inadvertently, but rather he drank some beers and went to bed.  He also pointed out that defendant admitted by the end of his own testimony that he did not know exactly what had happened when Sanchez was stabbed.

¶ 77    Then, in defendant's attorney's closing argument, he made the following statement addressing the comments above: "Now, when [defendant] was on the stand, he tried to answer the questions from me and the State. And he said some different things, but he's not lying. He's a

drunk, and he was a drunk in 2014. But did he lie about anything that would get him out of trouble? Did he lie about anything of significant importance?"

¶ 78    In rebuttal arguments, the prosecutor made further comments that defendant claims were prejudicial. He cites the prosecutor's statement that defendant was presumed innocent, "but once he takes that stand, ladies and gentlemen, once he starts to spin those web of lies and spin his versions or stories, he's not presumed truthful." He points to the statement, "He's the one here that has a motive to lie. Nobody else, him. And he told you some doozies. You know, lies change; the truth stays the same." He also cites the statement, "His testimony, his lies are an outrage and an affront to justice, and you should give it exactly the credence it deserved. None, none, none, none. He's a liar." Defendant cites the prosecutor's discussion of the ways in which the photographs of the scene allegedly contradicted defendant's testimony and the statement, "The pictures don't lie. He does." He cites the prosecutor's statement, "Counsel said, did he lie about anything that would get him in trouble? Yes. That's the whole point of his testimony." Finally, he cites the prosecutor's characterization of defendant's attempt to portray himself as the victim as "ridiculous, outrageous, an affront to justice and truth."

¶ 79    Defendant argues that in totality these comments implied that he and his attorney were lying, making up his testimony, and hiding the truth. He contends that, although he admitted to drinking heavily on the night at issue and was therefore confused about some of the details of what happened, this did not mean he was lying. Defendant contends that the prosecutor's repeated characterization of him as a liar took the determination of credibility away from the jury and served no purpose but to prejudice him.

¶ 80    We have reviewed the challenged comments in their full context, and we believe that they were fair comments on defendant's credibility and on how and why his testimony of what occurred

was unbelievable, contradictory, or unsupported by the evidence. Defendant contradicted himself multiple times during his testimony, and there were various ways in which his testimony was contradicted by other evidence in the case. The prosecutor had the right to comment on this evidence, as well as to discuss the various reasons why defendant's story that he had acted in self-defense was not believable. A prosecutor may call a defendant a liar or state that the defendant is lying if conflicts in the evidence cause such an assertion to be a fair inference. *People v. Smith*, 2014 IL App (1st) 103436, ¶ 69. That was the situation in this case, and defendant was not deprived of a fair trial by the prosecutor's statements that he was lying in his testimony.

¶ 81       Moreover, we agree with the State that the prosecutor's comments in rebuttal argument stating that defendant had lied in his testimony were made in response to the statements by defendant's attorney in closing that defendant had not lied, did not lie about anything that would get him out of trouble, and had not lied about anything important. As the prosecutor's comments in rebuttal were provoked or invited by the argument of defense counsel, they were not improper. *Glasper*, 234 Ill. 2d at 204.

¶ 82       Finally, we reject any suggestion by defendant that the prosecutor's comments improperly accused defendant's attorney of fabricating a theory of defense or of engaging in trickery, deception, or other wrongdoing. The challenged remarks all refer to defendant's testimony as a witness and, as discussed above, were fair comments on his credibility and on the evidence. The comments do not refer to his attorney or to any misconduct by his attorney, and therefore none of the comments were improper for that reason. *Kirchner*, 194 Ill. 2d at 549-51.

¶ 83       In conclusion, defendant has failed to establish that the prosecutor's closing arguments or rebuttal arguments constituted plain error.

¶ 84                                                    III. CONCLUSION

¶ 85       For the foregoing reasons, defendant's conviction is affirmed.

¶ 86       Affirmed.